In the Matter of the Application for Water Rights of Park County Sportsmen's Ranch,

**CITY OF AURORA, a municipal corporation of the counties of Adams, Arapahoe and Douglas, acting by and through its UTILITY ENTERPRISE; Park County Sportsmen's Ranch, L.L.P., a limited liability partnership; and Kenneth J. Burke, former counsel for Park County Sportsmen's Ranch, LLP, Applicants–Appellants.**

v.

**COLORADO STATE ENGINEER, Harold D. Simpson, Division Engineer for Water Division No. 1; Colorado Water Conservation Board; Colorado State Division of Wildlife; City of Thornton; City of Englewood; City and County of Denver; County of Park; Center of Colorado Water Conservancy District; Elkhorn Ranch Home Owners Association; Upper South Platte Water Conservancy District; Board of Commissioners of County of Park; Park County Water Preservation Coalition; United States of America; Centennial Water and Sanitation District; Union Pacific Resources Company; the Frieda Wahl Trust; Steve Bargas; Kimberly Bargas; Frida Bargas; H.D. and Mary Catherine Coleman; James T. Benes; James T. Benes, Jr.; Cassandra L. Benes Trust; Tarryall Land and Cattle LLC; Magness Land Holdings, LLC; Estate of Bob Magness; Personal Representative of the Estate of Bob Magness; Town of Fairplay; Jim Campbell; James Campbell; Ruth Bartle; Indian Mountain Corporation; Jill E. Boice; Bob Burch; Robert W. Heckendorf; Michael and Vicki Lothrop; Richard A. Grenfell; David Wilson; Darrell Johns; David Johns; John Johns; Joseph G. and Joyce C. Minke; James E. Copanos; Central Colorado**

Cattlemen's Association; Gregory Snapp; Roy G. Doerr; Erik Taylor; Wildwood Recreational Village Assoc.; Mark and Carol Carrington; Hansludwig Kommert; and Stephen R. Cline, Objectors–Appellees.

No. 01SA412.

Supreme Court of Colorado, En Banc.

Jan. 18, 2005.

As Modified on Denial of Rehearing Feb. 14, 2005.

See also 986 P.2d 262.

598 ■■■■ ■■■■■■■■■■■■■■■■■■■■■■■

Duncan, Ostrander & Dingess, P.C., John M. Dingess, Linda D. Obernyer, James Birch (Special Counsel), Denver, for Applicant–Appellant City of Aurora acting by and through its Utility Enterprise.

Porzak Browning & Bushong, Glenn E. Porzak, Steven J. Bushong, Kevin J. Kinnear, Boulder, Gary L. Crandell, P.C., Gary L. Crandell, Denver, for Applicant–Appellant Park County Sportsmen's Ranch, L.L.P.

White and Steele, PC, John M. Lebsack, Jennifer L. Tryjan, David Jaffee, Suzanna Wasito, Denver, for Applicant–Appellant

Kenneth J. Burke, former counsel for Park County Sportsmen's Ranch, LLP.

John W. Suthers, Acting Attorney General, Steven O. Sims, Assistant Attorney General, Susan J. Schneider, Assistant Attorney General, Natural Resources and Environment Section, Denver, for Objectors–Appellees Colorado state engineer, Harold D. Simpson, Division Engineer for Water Division No. 1; Colorado Water Conservation Board; and Colorado State Division of Wildlife.

Margaret A. Emerich, City Attorney, Dennis A. Hanson, Assistant City Attorney, Thornton, for Objector–Appellee City of Thornton.

Berg Hill Greenleaf & Ruscitti LLP, David G. Hill, Melissa M. Heidman, William I. Krasniewicz, Boulder, for Objector–Appellee City of Englewood.

Denver Water Department, Patricia L. Wells, Michael L. Walker, Mary B. Rastall, Anne E. Winans, Casey S. Funk, Henry C. Teigen, Denver, for Objector–Appellee City and County of Denver, acting by and through its Board of Water Commissioners.

Bernard, Lyons, Gaddis & Kahn, P.C., Jeffrey J. Kahn, Steven P. Jeffers, Madoline E.S. Wallace, Longmont, for Objectors–Appellees Board of Commissioners of County of Park and The Upper South Platte Water Conservancy District.

Felt, Monson & Culichia, LLC, James G. Felt, James W. Culichia, Colorado Springs, for Objector–Appellee Center of Colorado Water Conservancy District.

Vranesh & Raisch, LLP, Michael D. Shimmin, Lisa C. Ledet, Boulder, for Objectors–Appellees Park County Water Preservation Coalition, and H.D. and Mary Catherine Coleman.

US Department of Interior, Robert D. Comer, Special Assistant U.S. Attorney, Thomas R. Graf, Special Assistant U.S. Attorney, Office of Regional Solicitor, Lakewood, for Objector–Appellee United States of America.

Gilbert Y. Marchand, Jr., P.C., Gilbert Y. Marchand, Jr., Moses, Wittemyer, Harrison and Woodruff, P.C., Veronica A. Sperling, Boulder, for Objector–Appellee Centennial Water and Sanitation District.

Welborn Sullivan Meck & Tooley P.C., Stephen J. Sullivan, Molly Sommerville, Denver, for Union Pacific Resources Company n/k/a Anadako Petroleum Corporation.

Gilbert Y. Marchand, Jr., P.C., Gilbert Y. Marchand, Jr., Boulder, for Objectors–Appellees James T. Benes, James T. Benes, Jr., and Cassandra L. Benes Trust, and Tarryall Land and Cattle, LLC.

Tienken & Hill, L.L.P., Alan G. Hill, Louisville, for Objectors–Appellees The Frieda Wahl Trust, Steve Bargas, Kimberly Bargas and Frida Bargas.

Robert E. Schween, P.C., Robert E. Schween, Aurora, for Objector–Appellee Magness Land Holdings, LLC.

Petrock & Fendel, P.C., Frederick A. Fendel, Carmen S. Hall, Denver, for Objectors–Appellees Town of Fairplay, James Campbell, and Indian Mountain Corporation.

The Law Offices of Bennett S. Aisenberg, P.C., Bennett S. Aisenberg, H. Paul Himes, Jr., Denver, for Amicus Curiae Colorado Trial Lawyers Association.

No appearance by or on behalf of: County of Park; Elkhorn Ranch Home Owners Association; Estate of Bob Magness; Personal Representative of the Estate of Bob Magness; Jim Campbell; Jill E. Boice; Ruth Bartle; Bob Burch; Robert W. Heckendorf; Michael and Vicki Lothrop; Richard A. Grenfell; David A. Wilson; Darrell Johns; David Johns; John Johns; Joseph G. and Joyce C. Minke; James E. Copanos; Central Colorado Cattlemen's Association; Gregory Snapp; Roy G. Doerr; Erik Taylor; Wildwood Recreational Village Assoc.; Mark and Carol Carrington; Hansludwig Kommert; and Stephen R. Cline.

Justice RICE delivered the Opinion of the Court.

Plaintiff–Appellants, Park County Sportsmen's Ranch, LLP ("PCSR"), Kenneth J. Burke (PCSR's attorney at trial), and the City of Aurora, appeal from a judgment of the District Court for Water Division 1 dismissing PCSR's water rights application and awarding attorney fees and costs to objectors

who successfully opposed the application. First, we affirm the water court's decision dismissing PCSR's application for lack of an adequate augmentation plan. Second, we affirm the water court's award of costs to Opposers. Finally, we reverse the water court's award of attorney fees to Opposers, except for those amounts associated with PCSR's claims for precipitation and irrigation run-off, which were frivolous from inception. Because PCSR, as Aurora's agent, litigated a frivolous claim, we affirm the water court's order joining Aurora as a party for the purposes of determining attorney fees.

## I. Facts and Procedural History

PCSR is a Colorado partnership that owns a ranch in South Park, Colorado. The ranch is located within the South Park Basin, an area of about 90 square miles underlain by a natural geologic structure called the South Park Formation. The South Park Formation contains aquifers that PCSR intends to utilize in connection with a water project it calls the South Park Conjunctive Use Project (the "Project").[1] If implemented, the Project would allow PCSR to pump water from the aquifers and deliver it to the City of Aurora for municipal use.

On January 30, 1996, PCSR, acting for itself and as an agent for Aurora pursuant to an express contract, filed an application for determination of conditional underground and surface water rights and for approval of an augmentation plan in the District Court for Water Division 1 ("water court").[2]

In its application, PCSR sought to establish several conditional water rights, including (1) a conditional right to withdraw a specified amount of groundwater per year from the South Park aquifers through 26 proposed wells located on PCSR's land; (2) a conditional underground storage right to store water in the cone of depression created by pumping from the 26 proposed wells; and (3) absolute and conditional rights for surface storage and recharge collection systems.

To protect against injury to existing water users, PCSR also sought approval of an augmentation plan to replace injurious depletions to the South Platte tributaries caused by its proposed groundwater pumping. In its augmentation plan, PCSR initially identified four sources of replacement water. First, PCSR identified water rights for three springs, and a small reservoir, all previously decreed in a separate proceeding. PCSR claimed these rights free of the priority system as developed water.[3] Second, PCSR identified as-yet undecreed conditional surface water rights with 1996 priorities, including six reservoirs, a fourth spring, and a direct flow collection system. PCSR claimed water from this fourth spring free from the priority system pursuant to the futile call doctrine and as developed water.[4] Third, PCSR identified tributary groundwater to be withdrawn by the as-yet-undecreed 26 wells described in its application, including water

1. "Conjunctive use" means the joint use of groundwater and surface water resources. Because Colorado administers groundwater sources that affect or are affected by surface flow as part of the surface appropriation system, Colorado allows conjunctive users to use wells as alternate points of diversion for surface rights. James N. Corbridge, Jr. & Theresa A. Rice, *Vranesh's Colorado Water Law* 16 (rev. ed.1999).

2. PCSR was the only named party on the application. However, in its order concerning post-trial motions, the water court joined Aurora as a party pursuant to Opposers' motion for attorney fees and costs, and held that Aurora was liable for attorney fees. Consequently, Aurora is a party to this appeal. Mr. Burke is a party to this appeal by virtue of his being liable for attorney fees as PCSR's attorney at trial. For simplicity, we refer solely to PCSR when discussing the merits of the application.

3. Developed water is water that was not previously part of the river system and thus is not subject to administration by the state engineer. *See R.J.A., Inc. v. Water Users Ass'n of Dist. No. 6*, 690 P.2d 823, 825–26 (Colo.1984); *Pikes Peak Golf Club, Inc. v. Kuiper*, 169 Colo. 309, 315, 455 P.2d 882, 884–85 (1969) *overruled by Giffen v. State*, 690 P.2d 1244, 1247 (Colo.1984).

4. The futile call doctrine authorizes the state engineer to lift a curtailment order originally issued for the protection of decreed water rights under priority administration if the person whose diversion is curtailed proves that discontinuance of that diversion will not cause water to become available to senior priorities under a call for administration. *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1156 (Colo.2001).

withdrawn from PCSR's proposed underground reservoir. Lastly, PCSR identified as-yet-undecreed underground water rights in nontributary groundwater to be withdrawn from the Laramie–Fox Hills aquifer pursuant to a separate application.

By stipulation prior to trial, PCSR withdrew its claims that any of its augmentation sources would be administered free of the priority system, and acknowledged that its claimed water rights would have to be administered with 1996 priorities.[5] PCSR also withdrew its claim to change its previously decreed water rights to allow those rights to be used for augmentation. Finally, in a separate proceeding, the water court dismissed PCSR's application for the as-yet-undecreed underground water rights in the Laramie–Fox Hills aquifer. We affirmed the water court's judgment in *Park County Sportsmen's Ranch LLP v. Bargas*, 986 P.2d 262, 275 (Colo.1999)(hereinafter *Park County I* ). Accordingly, at the time of trial, PCSR's remaining augmentation sources were its as-yet-undecreed conditional surface rights with 1996 priorities, and its as-yet-undecreed underground storage reservoir.

· PCSR envisioned that its conditional rights and the augmentation plan would operate to implement the Project as follows: (1) initial groundwater pumping in excess of recharge would create a cone of depression in the underlying South Park aquifers, thereby creating underground storage capacity; (2) PCSR would deliver the withdrawn groundwater to the South Platte and its tributaries for downstream delivery to Aurora; (3) PCSR would then store surface water diverted in priority during times of heavy precipitation in recharge facilities overlying the South Park aquifers; (4) the water thus diverted and stored would percolate into the underlying aquifer, recharging it and reducing the volume of the cone of depression for the purpose of augmenting out-of-priority depletions.

After PCSR filed its water rights application, numerous objectors (collectively "Opposers")[6] filed statements of opposition, arguing that implementation of the Project would injure senior water interests in the South Park Basin. Specifically, Opposers challenged the adequacy of PCSR's augmentation plan to replace depletions to the South Platte tributaries resulting from groundwater pumping.

To support the adequacy of its application and its augmentation plan, PCSR retained a consulting firm to develop both a groundwater and a surface water model of the South Park Basin. In its groundwater model,[7] the consulting firm used data gathered from existing wells in the South Park Basin and aquifer testing sites on PCSR's property to predict the effect of the Project on the South Platte and its tributaries.

---

5. PCSR still claimed an 1878 appropriation date for the fourth spring.

6. The Opposers who participated in trial and on appeal are the Colorado state engineer; the Division Engineer for Water Division No. 1; Colorado Water Conservation Board, Colorado Division of Wildlife; City of Thornton; City of Englewood; City and County of Denver; County of Park; Center of Colorado Water Conservancy District; Elkhorn Ranch Home Owners Association; Upper South Platte Water Conservancy District; Board of Commissioners of County of Park; Park County Water Preservation Coalition; United States of America; Centennial Water and Sanitation District; Union Pacific Resources Company; The Frieda Wahl Trust; Steve Bargas; Kimberly Bargas; Frida Bargas; H.D. & Mary Catherine Coleman; James T. Benes; James T. Benes, Jr. & Cassandra L. Benes Trust; Tarryall Land & Cattle, LLC; Magness Land Holdings, LLC; Estate of Bob Magness; Town of Fairplay; James Campbell/Indian Mountain Corporation; Ruth Bartle; Jill E. Boice; Bob Burch; Robert W. Heckendorf; Michael & Vicki Lothrop; Richard A. Grenfell; David Wilson; Darrell Johns; David Johns; John Johns; Joseph G. & Joyce C. Minke; James E. Copanos; Central Colorado Cattlemen's Association; Gregory Snapp; Roy G. Doerr; Erik Taylor; Wildwood Recreational Village Association; Mark & Carol Carrington; Hansludwig Kommert; and Stephen R. Cline. These Opposers participated in varying degrees and capacities at trial. For simplicity, we refer *in this opinion to actions taken by "the Opposers" without specifying the particular Opposers or noting that other Opposers did not join.

7. The consulting firm developed its groundwater model using MODFLOW, a computer program developed by the United States Geological Survey to simulate groundwater systems in three dimensions.

In its surface water model,[8] the consulting firm used stream gauge data from an adjacent drainage to predict the amount of water available from in-priority surface diversions for its augmentation plan.

In October 1998, one of PCSR's scientists, Dr. Harvey Eastman, circulated a memorandum suggesting model-related tasks that would be useful to both enhance the groundwater model, and to assist in and perform sensitivity analyses for the groundwater model (the "Eastman Memo"). It appears that PCSR completed some, but not all of these tasks.

Shortly before trial, PCSR submitted a proposed decree containing a new exhibit (called "New Exhibit Z") that abandoned use of the models discussed above in favor of an extensive monitoring plan which would prospectively quantify and replace depletions caused by the Project.[9] Although the water court admitted the proposed decree, it excluded expert testimony in support of the monitoring plan from PCSR's case-in-chief because PCSR failed to timely disclose the testimony. Thus, during its case-in-chief, PCSR was required to use only the groundwater and surface water model results to support the adequacy of its augmentation plan.

In an eight-week trial to the water court in July and August 2000, PCSR presented extensive expert testimony in support of its models. At the end of PCSR's case-in-chief, Opposers moved for dismissal pursuant to C.R.C.P. 41(b)(1). Following a two-day hearing, the water court dismissed PCSR's application. The water court concluded that: (1) PCSR's groundwater model did not produce sufficiently reliable results to permit a reasonably accurate determination of the timing, amount, and location of stream depletions or to determine the rate of aquifer recharge resulting from PCSR's recharge facilities; and (2) PCSR's surface water model did not produce sufficiently reliable results to determine stream flow or legal availability of replacement water for PCSR's project. As a result, the water court concluded that PCSR failed to meet its burden of proof with respect to its augmentation plan to quantify injurious depletions in time, place, and location, and thus, dismissed PCSR's augmentation plan and application for conditional rights.

In post-trial motions to the court, PCSR sought reconsideration of the court's dismissal; Opposers sought attorney fees and costs, and the joinder of Aurora as a party for purposes of collecting attorney fees and costs. The water court denied PCSR's motion, and granted Opposers' motions for fees and costs, and joinder of Aurora.

The court reiterated its initial conclusions, and further determined that: (1) water cannot be stored in a saturated aquifer that is tributary to an overappropriated stream system; (2) PCSR's application became groundless as of October 28, 1998, the date of the Eastman Memo; (3) PCSR's claims for augmentation credits arising from precipitation, irrigation return flows, and decreases in evapotranspiration losses were frivolous from their inception; and (4) because Aurora was PCSR's principal with respect to the application, Aurora was liable for costs and attorney fees imposed against PCSR. The court later absolved Aurora of liability for costs, but not for attorney fees.

Subsequently, the court held an evidentiary hearing to determine the amount of attorney fees and costs. Based on evidence presented at that hearing, the water court issued a judgment awarding certain of Opposers over $2.5 million in costs and attorney fees. PCSR, Mr. Burke, and Aurora appealed the water court's judgment to this Court.[10]

---

**8.** The consulting firm developed its surface model using RIBSIM, a computer modeling program developed by a member of the firm.

**9.** PCSR's initial proposed decree, filed in 1999, also contained a proposed monitoring plan. However, it is clear from this initial decree that PCSR intended to perform substantial simulation and modeling *prior to* initiation of pumping and *in conjunction* with physical evaluation of stream flows after initiation of pumping.

**10.** Section 13–4–102(1)(d), C.R.S. (2004), grants us initial jurisdiction over final judgments of district courts in water cases involving priorities or adjudications.

We hold that the water court did not abuse its discretion in dismissing PCSR's application or in awarding reasonable costs to certain of Opposers. However, except with respect to PCSR's storage claims for precipitation and irrigation run-off, we hold that the water court abused its discretion in finding PCSR's claims groundless and frivolous, and in awarding attorney fees to Opposers. Therefore, as set forth in our opinion below, we affirm in part, and reverse in part the water court's judgment, and remand for further proceedings in accordance with this opinion.

## II. Dismissal of PCSR's Application

As noted above, PCSR envisioned that its conditional rights and the augmentation plan would operate together to implement the Project. The water court, however, dismissed the application for conditional underground and surface water rights primarily because it found the proposed augmentation plan fatally flawed. PCSR argues that the water court erred in so concluding, alleging numerous mistakes.[11]

To review the water court's judgment, we must first determine whether it was correct in its initial assessment that PCSR must replace 100% of its withdrawals. We find that the court did not err in concluding that any analysis of the augmentation plan must start with the assumption that 100% of the proposed withdrawals that would cause material injury to other water users must be replaced. Similarly, we review PCSR's contention that the water court improperly denied it "credit" for reductions in evapotranspiration, such that PCSR was improperly required to provide more augmentation water than legally required. We hold that the

water court properly determined that PCSR was not entitled to evapotranspiration credit.

Holding that PCSR's proposed augmentation plan could only be approved if 100% of its proposed withdrawals are replaced, we next analyze whether the augmentation plan was appropriately dismissed. We first address the propriety of the water court's pre-trial evidentiary rulings. In so doing, we conclude the water court properly limited PCSR's presentation of scientific evidence due to PCSR's failure to timely disclose alternative evidence in the nature of (1) sensitivity analyses performed on the groundwater model, (2) an analysis of water availability for four years after the application was filed, (3) evidence regarding a Glover analysis, and (4) expert testimony in support of "New Exhibit Z."

We next review the water court's trial rulings. As a consequence of pre-trial rulings limiting the evidence which PCSR could present at trial, the results from PCSR's groundwater and surface water models were PCSR's only scientific evidence at trial. Because the water court properly concluded that this evidence was not sufficiently reliable pursuant to CRE 702, the water court dismissed PCSR's application pursuant to C.R.C.P. 41(b)(1), holding that PCSR failed to meet its burden of proof with respect to its augmentation plan to quantify injurious depletions in time, place, and location, and dismissing its application. We find no error in the water court's analysis.

Finally, we determine that the water court did not err when it refused to invoke retained jurisdiction to decide the issue of injury.

---

11. PCSR, Aurora, and Mr. Burke filed a total of eight briefs in support of their appeal, many of which assert identical or overlapping arguments. PCSR, Burke, and Aurora assert the following errors in the water court's judgment dismissing its application: (1) the water court erred as a matter of law in requiring 100% replacement of out-of-priority withdrawals; (2) the water court erred in dismissing the augmentation plan by (a) applying the wrong standard for dismissal, (b) improperly precluding evidence of protective terms and conditions, and (c) improperly ignoring the purpose of retained jurisdiction to ad-

dress uncertainties; (3) the water court created an impossible standard for conjunctive use projects by misapplying the law of underground storage; (4) the water court erred in dismissing PCSR's remaining conditional water rights for surface diversions; (5) the water court erred in denying credit for reduced evapotranspiration; (6) the water court findings regarding the models were unsupported in the record and were not a basis for dismissal; and (7) the water court abused its discretion in excluding some of the very evidence it claimed was lacking in support of the augmentation plan.

## A. 100% Replacement of Withdrawals Required

■ PCSR argues that the water court erred in requiring it to replace 100% of its groundwater withdrawals. We disagree. The water court held that, although Colorado law does not require an out-of-priority diverter to replace 100% of its withdrawals, "PCSR is nevertheless required to replace 100% of its withdrawals *that would cause material injury* to other users if not replaced" (emphasis added).

Our cases support the water court's determination. *Park County I*, 986 P.2d at 275; *see also Cache LaPoudre Water Users Ass'n v. Glacier View Meadows*, 191 Colo. 53, 62, 550 P.2d 288, 294 (1976)("water is available for appropriation if the diversion thereof does not injure holders of vested rights"). Thus, to the extent an applicant can prove that its depletions are non-injurious, or that its injurious depletions are less than its withdrawals, it is not required to replace 100% of its withdrawals. PCSR, however, failed to prove either of these.

■ Where surface water is overappropriated,[12] Colorado law presumes that groundwater depletions through well-pumping result in injury to senior appropriators absent a showing to the contrary. *Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 59 n. 7 (Colo.2003); *Alamosa–La Jara Water Users Prot. Ass'n v. Gould*, 674 P.2d 914, 931 (Colo. 1983). The South Platte River Basin is substantially overappropriated. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 71 n. 66 (Colo.1996); *Hall v. Kuiper*, 181 Colo. 130, 132, 510 P.2d 329, 330 (1973). Thus, absent a showing to the contrary, groundwater depletions resulting from PCSR's withdrawals are presumed injurious.

PCSR could have demonstrated that depletions resulting from its diversions would occur when senior water rights do not have a call on the river, and, thus, would not cause injury. *See Cache La Poudre Water Users Ass'n*, 191 Colo. at 59–62, 550 P.2d at 293–94 (holding that where senior users can show no injury by the diversion of water, they cannot preclude the beneficial use of water by another); *Park County I*, 986 P.2d at 275. However, PCSR failed to prove the timing of depletions resulting from its well-pumping.

PCSR also could have demonstrated that its depletions would be less than its withdrawals because of anticipated return flows. *See Kelly Ranch v. Southeastern Colo. Water Conservancy Dist.*, 191 Colo. 65, 77, 550 P.2d 297, 306 (1976) ("If [applicant] does not prove to the satisfaction of the court that there is any return flow … then the court will be obliged to order release into the stream of 100% of the amount of water withdrawn from such wells from which there is no return flow."). However, PCSR presented no evidence of anticipated return flows. To the contrary, PCSR claimed the right to fully consume all the water that it pumped.

Accordingly, because PCSR failed to prove the timing of depletions and failed to present evidence of return flows, the water court was required to order 100% replacement of withdrawals. *See id.*

■ Regardless of these conclusions, PCSR argues that 100% replacement of withdrawals is improper because some of its withdrawals will be offset by reductions in evapotranspiration resulting from the Project ("salvaged water").[13] PCSR sought augmentation credits for this salvaged water. In a partial summary judgment motion prior to trial, the water court denied the claim for augmentation credits, citing section 37–92–

12. Surface water is overappropriated when there is not enough water in the stream during irrigation season or at other times of the year to satisfy all decreed appropriations. *Hall v. Kuiper*, 181 Colo. 130, 132, 510 P.2d 329, 330 (1973).

13. Native vegetation acts like a pump sucking up water that would ordinarily be available for appropriation. *See Southeastern Colo. Water Conservancy Dist. v. Shelton Farms*, 187 Colo. 181, 187–88, 529 P.2d 1321, 1325 (1974). Once PCSR starts pumping water from the South Park aquifers, the resulting cone of depression will create a significant drop in the water table. As a result, native vegetation existing on the surface overlying the aquifer will have limited means of obtaining water and nutrients, and will eventually die, thereby freeing water that belongs to the system for appropriation. This water is referred to as "salvaged water." *Id.* Because salvaged water is considered part of the stream, it is not available for independent appropriation outside of the priority system. *Id.*

103(9), 10 C.R.S. (2000), which precludes an applicant from claiming credit for salvaged water in an augmentation plan. PCSR argues that it is entitled to the salvaged water because its underground storage facility is analogous to gravel pits and on-stream reservoirs, both of which are exceptions to this rule. We disagree.

■ Water resulting from reduced consumption by native plants is commonly referred to as "salvaged water." *See Southeastern Colo. Water Conservancy Dist. v. Shelton Farms,* 187 Colo. 181, 187, 529 P.2d 1321, 1325 (1975). An applicant may not claim credit for salvaged water in a plan for augmentation. § 37–92–103(9), C.R.S. (2004). This rule applies to all native vegetation, whether or not it is classified as phreatophytic.[14] *Giffen v. State,* 690 P.2d 1244, 1247–48 (Colo.1984). There are two exceptions to this rule for unlined gravel pits, section 37–92–305(12)(a), C.R.S. (2004), and on-stream reservoirs, section 37–84–117(5), C.R.S. (2004). PCSR argues that it is entitled to credit for salvaged water because its underground storage facility is analogous to these exceptions.

Section 37–92–305(12)(a) is a narrowly drafted provision that allows owners of gravel pits to take credit for the historical consumption of water by the pre-existing natural vegetative cover in determining the amount of water lost to evaporation from the surface of the pit.[15] Likewise, section 37–84–117(5) allows credit against the calculation of evaporation losses from the surface of on-stream reservoirs for any losses that would occur naturally if the reservoir had not been constructed.[16]

■ Exceptions to the general laws should be narrowly construed. *See, e.g., Sargent Sch. Dist. RE–33J v. W. Servs., Inc.,* 751 P.2d 56, 60 (Colo.1988) (statutory exceptions to the Colorado Open Records Act should be narrowly construed). The legislature, not the court, should expand these exceptions if desirable. *Shelton Farms,* 187 Colo. at 192, 529 P.2d at 1327. Because the legislature has not provided for the type of credit claimed by PCSR, we refuse to imply it.

■ PCSR also argues that the water court's ruling is in conflict with the Water Right Determination and Administration Act of 1969 ("1969 Act") as it pertains to wells. Section 37–92–501(1), C.R.S. (2004), provides in relevant part:

> It is the legislative intent . . . that ground water diversions shall not be curtailed nor required to replace water withdrawn, for the benefit of surface right priorities, even though such surface right priorities be senior in priority date, when, assuming the absence of ground water withdrawal by junior priorities, water would not have been available for diversion by such surface right under the priority system.

PCSR maintains this provision merits reversal of the water court's decision. We disagree. This provision gives administrative direction to the state engineer. It does not instruct water courts to ignore 37–92–103(9) and related case law, much less approve the use of salvaged water for augmentation credits free of the call of the river. PCSR also argues that the adoption of House

---

**14.** Phreatophytes are "water-loving plants that grow along ditches and streams, resulting in the loss of water through evapotranspiration and may seriously impede the flow of water." Corbridge & Rice, *supra,* at 121 n. 593.

**15.** Section 37–92–305(12)(a) states:

> In determining the quantity of water required in an augmentation plan to replace evaporation from ground water exposed to the atmosphere in connection with the extraction of sand and gravel by open mining as defined in section 34–32–103(9), C.R.S., there shall be no requirement to replace the amount of historic natural depletion to the waters of the state, if any, caused by the preexisting natural vegeta-

tive cover on the surface of the area which will be, or which has been, permanently replaced by an open water surface. The applicant shall bear the burden of proving the historic natural depletion.

**16.** Section 37–84–117(5) provides in relevant part that:

> In determining the quantity of any evaporation release under this section, the state engineer shall compute the surface evaporation from the reservoir and deduct therefrom any accretions to the stream flow resulting from the existence of the reservoir and any natural depletions to the stream flow which would have resulted if the reservoir were not in existence.

Bill 98–1011, codified in sections 37–90–102(3), 37–90–137(12), and 37–92–305(6)(c), 10 C.R.S. (2002), should be interpreted as overturning the rule against salvaged water codified in section 37–92–103(9). The General Assembly enacted special rules for the confined aquifer underlying portions of the San Luis Valley in Water Division 3 by declaring that for new groundwater withdrawals, the "reduction of water consumption by nonirrigated native vegetation" shall not factor into the determination of water availability or injury. § 37–92–305(6)(c), C.R.S. (2004); § 37–90–137(12)(b)(I), 10 C.R.S. (2002)(repealed 2004). PCSR argues that because there are no similar provisions for other water divisions, use of salvaged water for augmentation credit with respect to well-pumping in these other water divisions is allowed. We disagree.

The General Assembly enacted special rules for the confined aquifer in Water Division 3 because, at the time, the aquifer systems and their relation to surface streams were poorly understood. *See* § 37–90–102(3)(a), 10 C.R.S. (2002) (repealed 2004). As such, the General Assembly enacted guidelines for the state engineer to follow when granting well permits in the area. § 37–90–102(3)(a). We note that the General Assembly assured that new withdrawals from the confined aquifer would be properly augmented so as not to injure vested water rights or increase Colorado's delivery obligations under the Rio Grande Compact. § 37–90–102(3)(a). Further, when enacted, sections 37–92–305(6)(c) and 37–90–137(12)(b)(I) did not constitute a repeal of *Shelton Farms* or *Giffen*. *See Preston v. Dupont,* 35 P.3d 433, 440–41 (Colo.2001) ("Although the General Assembly possesses the authority to abrogate common law remedies, we will not infer a legislative abrogation of that right absent a clear expression of intent.").

Finally, PCSR maintains that we have suggested that it may be permissible for wells to take credit for salvaged water, and that water court precedent exists in support of wells taking credits for salvaged water. To the contrary, we have never expressly or impliedly approved the use of salvaged water in an augmentation plan.

In support of its argument, PCSR cites our opinions in *Kuiper v. Atchison, Topeka & Santa Fe Railway Co.,* 195 Colo. 557, 561, 581 P.2d 293, 295 (1978), *Jaeger v. Colo. Ground Water Commission,* 746 P.2d 515, 523 n. 10 (Colo.1987), *Closed Basin Landowners Ass'n v. Rio Grande Water Conservation District,* 734 P.2d 627, 629–31, 635–37 (Colo.1987), *Alamosa–La Jara Water Users Protection Ass'n v. Gould,* 674 P.2d 914, 920 (Colo.1983), and *American Water Development, Inc. v. City of Alamosa,* 874 P.2d 352, 368 (Colo.1994)(hereinafter *AWDI* ).

In *Kuiper,* we merely observed that well-pumping may result in some reduction in evapotranspiration losses in the Arkansas River drainage. 195 Colo. at 561, 581 P.2d at 295. Likewise, in *Alamosa–La Jara,* we simply repeated the applicant's evidence and the trial court's finding that well-pumping salvaged a substantial amount of water. 674 P.2d at 920. Both of these cases considered rules and regulations promulgated by the state engineer, not the adjudication of a plan for augmentation. Moreover, neither case considered the ruling in *Shelton Farms,* or the existing statutory prohibition in section 37–92–103(9). In *Jaeger* and *Closed Basin,* we expressly declined to consider whether or not *Shelton Farms* applied to the respective facts. 746 P.2d at 523 n. 10; 734 P.2d at 637.

Finally, in *AWDI,* we merely acknowledged the water court's factual findings, which rejected the applicant's groundwater model in part because it overstated the reduction in evapotranspiration resulting from pumping. 874 P.2d at 368. We did not approve the use of salvaged water in an augmentation plan, and we did not consider *Shelton Farms* or section 37–92–103(9).

Thus, none of these cases provides authority for us to allow PCSR to claim credit for salvaged water in an augmentation plan. Accordingly, the water court properly denied PCSR's claimed augmentation credits for salvaged water.

In summary, because PCSR failed to establish the timing of its depletions, failed to establish anticipated return flows, and failed

to set forth proper claims for augmentation credits, it is required to replace 100% of its withdrawals.

## B. Dismissal of PCSR's Augmentation Plan

▬ We now address whether the water court appropriately dismissed the augmentation plan. To establish that its augmentation plan could adequately replace 100% of withdrawals, PCSR was required to prove the location, time, and quantity of its depletions, and the legal availability of replacement water. At a pretrial hearing, the water court excluded PCSR's evidence of (1) sensitivity analyses performed on the groundwater model, (2) an analysis of water availability for four years after the application was filed, (3) evidence regarding a Glover analysis, and (4) expert testimony in support of "New Exhibit Z" due to PCSR's failure to timely disclose this evidence. Thereafter, at the close of PCSR's case-in-chief, the water court concluded that PCSR failed to establish the location, time, and quantity of its depletions, and the legal availability of replacement water because its scientific evidence was not sufficiently reliable to be admissible pursuant to CRE 702. We find no error in the water court's analysis.[17]

### 1. Pretrial Evidentiary Rulings

We first discuss the propriety of the water court's pretrial evidentiary rulings excluding evidence in the nature of (1) sensitivity analyses performed on the groundwater model, (2) an analysis of water availability for four years after the application was filed, (3) evidence regarding a Glover analysis,[18] and (4) expert testimony in support of "New Exhibit Z" due to PCSR's failure to timely disclose this evidence.

▬ PCSR acknowledged its failure to timely disclose the evidence by the disclosure deadline for its case-in-chief, which was December 31, 1998. PCSR did not prepare its new water availability analysis until November 1999, and PCSR only first revealed expert reports in support of New Exhibit Z in its rebuttal disclosures filed just two months before trial. Likewise, PCSR first revealed its sensitivity and Glover analyses after the rebuttal disclosure deadline. However, PCSR argues that its failure to disclose was harmless and its evidence should have been admitted. We disagree.

▬ Trial courts have wide latitude to accept or refuse evidence. *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1170 (Colo.2002). Reviewing courts may not overturn evidentiary rulings absent a clear abuse of discretion. *Id.* A party offering late-disclosed evidence bears the burden of showing that the failure to disclose was harmless or justified. *See Todd v. Bear Valley Vill. Apartments*, 980 P.2d 973, 978 (Colo.1999).

Here, the water court carefully reviewed the offered evidence and the prejudice that would result from its admission in PCSR's case-in-chief. We find no abuse of discretion in the water court's decision to exclude the proffered evidence.

### a. Sensitivity Analyses

The water court held that testimony concerning sensitivity analyses would prejudice Opposers because Opposers did not have the chance to conduct discovery or prepare for cross-examination. PCSR offered no valid justification for its late disclosure. Accordingly, the water court did not abuse its discretion in excluding the evidence from PCSR's case-in-chief.

### b. Water Availability Analysis

The water court excluded PCSR's water availability analysis because it was untimely disclosed; it was generated from new infor-

---

17. PCSR argues that the water court (1) applied the wrong standard for dismissal; (2) improperly precluded evidence of terms and conditions; and (3) improperly ignored the purpose of retained jurisdiction to address uncertainties. PCSR further maintains that the water court compounded these errors by (1) improperly excluding evidence in support of the augmentation plan; (2) improperly denying credits for reduced evapo-

transpiration; and (3) making factual findings regarding the reliability of the model results that were not supported in the record and not a basis for dismissal.

18. A Glover analysis is a combination of equations used to determine irrigation return flows.

mation and data not otherwise in evidence or revealed in PCSR's case-in-chief; and it was irrelevant to PCSR's case because evidence of water availability should be based on stream flows as of the date of the claimed appropriation and not events occurring thereafter. *See In Re Bd. of County Comm'rs of Arapahoe County*, 891 P.2d 952, 962 (Colo.1995). Because the evidence was irrelevant to PCSR's case, the water court did not abuse its discretion in excluding the evidence.

### c. Glover Analysis

Likewise, the water court held that admitting the late-disclosed Glover analysis would prejudice Opposers because it was not a standard Glover analysis, and Opposers had inadequate time to determine whether the analysis met the requirements for scientific acceptance. PCSR admitted the evidence was prepared to rebut Opposers' evidence, and provided no valid justification for its late disclosure. Accordingly, the water court held that PCSR's failure to disclose was neither harmless nor justified, and properly excluded the analysis from PCSR's case-in-chief.

### d. New Exhibit Z

Though the water court admitted PCSR's stipulations containing New Exhibit Z, it excluded expert testimony in support of New Exhibit Z because it was untimely disclosed, and because it was a new theory of injury whose use would prejudice Opposers if allowed in PCSR's case-in-chief. Nonetheless, PCSR maintains it timely disclosed New Exhibit Z pursuant to Rule 2(f) of the Uniform Local Rules for All State Water Court Divisions, and that its monitoring program had been a key aspect of its application from the beginning. We disagree.

Rule 2(f) governs filing and service procedures in water cases and provides that:

An applicant shall file and serve upon all parties at least 15 days prior to hearing on any application before the water judge, a proposed order that sets forth any necessary findings, terms or conditions that the applicant reasonably believes the court should incorporate into the decree.

Rule 2(f) contains no reference to the admission of expert testimony in support of an application. Rather, it is C.R.C.P. 26(a)(2) [19] that governs the disclosure of expert testimony, and the water court properly complied with it when it precluded admission of New Exhibit Z. Finding otherwise would allow a party to admit expert evidence on the eve of trial without allowing an opposer to properly prepare.

Further, although PCSR's original Exhibit Z, filed in 1999, included aspects of a monitoring plan, it relied primarily on the groundwater model's projected depletions. In its New Exhibit Z, PCSR suggested in its own disclosures that the groundwater model "be dropped" in favor of a prospective monitoring program to prevent injury. In essence, PCSR abandoned any intention to accurately predict depletions before the fact, preferring instead to measure depletions after the fact. Accordingly, the record supports the water court's determination that PCSR's New Exhibit Z proposed a new theory of injury prevention at the last minute. Therefore, the water court did not abuse its discretion in excluding New Exhibit Z from PCSR's case-in-chief.

As such, the water court properly limited PCSR's scientific evidence at trial to presentation of the groundwater and surface water model results.

### 2. Evidence at Trial

■ Because the water court did not abuse its discretion in limiting PCSR's scientific evidence at trial, we now address the water court's conclusion that the scientific evidence PCSR presented at trial was not sufficiently reliable to be admissible under CRE 702.[20]

**19.** C.R.C.P. 26(a)(2) provides that "a party shall disclose to other parties the identity of any person who may present evidence at trial," and that such disclosure shall be accompanied by a writ-ten summary containing a complete statement of all opinions to be expressed.

**20.** PCSR argued that the water court's conclusions concerning its groundwater and surface

In Colorado, CRE 702 governs the admission of scientific evidence and expert testimony. *People v. Shreck*, 22 P.3d 68, 77–78 (Colo.2001). The focus of a CRE 702 inquiry is whether the proffered scientific evidence is both reliable and relevant. *Id.* To determine the reliability of scientific evidence under CRE 702, the court's inquiry should be broad in scope and consider the totality of the circumstances presented in each case. *Id.* In performing its inquiry, the court may consider a wide range of factors that are pertinent to the case at issue. *Id.* The court should also apply its discretionary authority under CRE 403 to "ensure that the probative value of the evidence is not substantially outweighed by unfair prejudice." *Id.* The court must issue specific findings as it performs its CRE 702 and 403 analyses. *Id.*

Trial courts are vested with broad discretion to determine the admissibility of expert testimony. *Masters v. People*, 58 P.3d 979, 988 (Colo.2002). The trial court is vested with this discretion because it has a superior opportunity to determine the competence of the expert. *Id.* In addition, this deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful. *Id.* As such, a trial court's exercise of its discretion will not be overturned unless manifestly erroneous.

We hold that the water court's exercise of discretion was not manifestly erroneous. The water court properly considered factors pertinent to this case, and issued specific findings regarding the reliability of the groundwater and surface water models.[21] Specifically, the water court found that:

[T]he model itself, is widely used to model aquifer parameters, among other uses, and ... it is capable of producing reliable, relevant results. However, the court concludes that, in order for computer modeling results to be reliable, and hence relevant, for predicting the timing and amount of both depletions and recharge, the model must be operated in a manner that is consistent with accepted modeling techniques. If the model is operated in some other manner, there must be sufficient evidence that such other method produces valid and reliable results.

The water court then carefully analyzed the evidence as to the modeling techniques that PCSR's experts employed to operate the groundwater and surface water models used in this case. After noting the relevant techniques, the water court determined PCSR's experts committed errors in technique with respect to the groundwater model because they failed to conduct a sensitivity analysis on the model,[22] failed to properly calibrate the model,[23] failed to explain anomalous re-

---

water models were (1) not supported in the record, and (2) in the alternative, were not a basis for dismissal. We address the first argument in this section using the framework we set forth in *People v. Shreck*, 22 P.3d 68, 77–78 (Colo.2001), to determine the admissibility of scientific evidence. We approach our analysis in this manner because the water court cited to *Shreck* in its order dismissing PCSR's application, and indicated that it based its conclusions regarding the reliability of the groundwater and surface water model results on a *Shreck* analysis ("[T]he court concludes that, in order for the computer modeling results to be reliable, and hence relevant, for predicting the timing and amount of both depletions and recharge, the model must be operated in a manner that is consistent with accepted modeling techniques."). We address PCSR's alternative argument when we address the standard of dismissal pursuant to C.R.C.P. 41(b)(1).

21. The water court did not hold a separate pretrial hearing to determine the admissibility of PCSR's scientific testimony during trial. Rather,

the water court engaged in its CRE 702 analysis in its order dismissing PCSR's application.

22. A sensitivity analysis is a method of determining the effect of parameter variation on model results so as to quantify the uncertainty in the calibrated model caused by uncertainty in model parameters. Though Eastman documented his observations of sensitivity in the model parameters as he adjusted them during calibrations, these observations are not a substitute for the type of formal, post-calibration sensitivity analyses required in modeling applications.

23. Calibration is the process of adjusting aquifer parameters in the model within reasonable ranges determined by aquifer test data to obtain a match between measured and model-predicted water levels. Model parameters should be based upon actual data taken from calibration targets in the model area. In this case, PCSR's calibration was improper for several reasons. First, PCSR used poor-quality calibration targets, the majority of which were outside of the main

sults and residual errors,[24] ignored another expert's report suggesting further evaluation, and failed to complete an independent peer review of the model.

The court further determined that PCSR's experts committed errors in technique with respect to the surface water model because PCSR failed to adjust calculations for the changing call regime,[25] failed to factor out irrigation run-off,[26] failed to consider variables other than precipitation,[27] and failed to determine the range of errors [28] for its simulated stream flows.

Relying on these findings, the water court held that the groundwater model, as operated in this case, failed to produce sufficiently reliable results to permit a reasonably accurate determination of the timing, amount, and location of depletions, or the timing and amount of aquifer recharge. The water court further held that the surface water model, as operated in this case, failed to produce sufficiently reliable results to permit a reasonably accurate determination of either average stream flow or legal availability of augmentation water. Because the water court's exercise of discretion was not manifestly erroneous, we refuse to overturn it on appeal.[29]

### 3. Standard for Dismissal Pursuant to C.R.C.P. 41(b)(1)

Based on our finding that the water court's determination was proper, we next address whether the water court applied the proper standard for dismissal under C.R.C.P. 41(b)(1).

In both orders dismissing PCSR's application, the water court cited *Teodonno v. Bachman*, 158 Colo. 1, 4, 404 P.2d 284, 285 (1965), holding that the applicable standard for dismissal under Rule 41(b)(1) is whether judgment in favor of defendant is justified on the evidence presented. Citing our holding in *Public Service Co. of Colorado v. Pueblo Board of Water Works*, 831 P.2d 470, 480 (Colo.1992), PCSR argues that it was only required to meet a prima facie case to survive dismissal of its augmentation plan.

We hold that the water court applied the proper standard of dismissal in reviewing PCSR's application. Our decision in *Public Service Co.* only applies when a court reaches the issue of injury in a change of water right or augmentation plan proceeding. Because of the water court's pre-trial evidentiary rulings, PCSR's sole evidence in support of its augmentation plan was its groundwater and surface water model results. Because these results failed to establish sufficiently reliable

pumping area, and most of which produced, in the words of Eastman, "suspect" measurements. Second, rather than use actual, measured data to calibrate the model, PCSR used the model to manufacture hydrogeologic parameters which it then used to calibrate the model. Finally, Eastman admitted that PCSR improperly changed aquifer parameters after "calibrating" the model.

**24.** A "residual" is the difference between measured and model-predicted water levels.

**25.** PCSR expert, Ross Bethel, assumed that the call pattern from 1950 to 1996 would replicate itself over the first forty-seven years of the Project. However, he acknowledged in cross-examination that higher frequency of calls from South Platte water users has been observed in recent years, and that new water rights have started calling since 1950. Evidence admitted in cross-examination demonstrated that the legal availability of water in the early 1990s was substantially less than that legally available in comparable flow years from 1950 to 1985.

**26.** Though Bethel considered irrigation return flows in his water availability analysis, he admit-

ted that he did not consider the legal availability of the irrigation runoff.

**27.** For example, the court indicated that PCSR should have considered the influence of basin length-width ratios, basin mean slopes, subsurface geology, and the nature of the vegetative cover in determining the amount of run-off.

**28.** In one model area basin, average simulated flows were more than 1000 acre feet higher than gauged flows. Without a range of error determination, the court could not determine best- and worst-case scenarios for the model's predictions.

**29.** However, as discussed in our decision to reverse the water court's award of attorney fees, we find no support in the record for the water court's finding that PCSR ignored its own expert's report suggesting further evaluation. Nevertheless, because this factor was only one of many that influenced the water court's conclusions regarding the model results, and because the other factors had ample support in the record, it does not affect our analysis of the water court's decision on this issue.

evidence quantifying depletions and the legal availability of replacement water, the water court was unable to reach the issue of injury.

Rule 41(b)(1) motions provide the court with an opportunity to evaluate the evidence and to determine whether the plaintiff has satisfied its burden of proof so as to require the other side to present its case.[30] Rule 41(b)(1) provides in relevant part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. *The court as trier of the facts may then determine them and render judgment against the plaintiff* or may decline to render judgment until the close of all the evidence

(emphasis added).

 Accordingly, where the court is the trier of fact and a party brings a Rule 41(b)(1) motion to dismiss, the standard is not whether the plaintiff established a prima facie case, but whether judgment in favor of defendant is justified on the evidence presented. *Teodonno*, 158 Colo. at 4, 404 P.2d at 285; *Rowe v. Bowers*, 160 Colo. 379, 381, 417 P.2d 503, 505 (1966). Consequently, the water court is not required to accept evidence as true, but may determine the facts and enter judgment against the plaintiff. *Id.; see also Pioneer Constr. Co. v. Richardson*, 176 Colo. 254, 259, 490 P.2d 71, 74 (1971) ("a court, acting as fact finder, is not bound to accept a statement as true because there is no direct testimony contradicting it"). In making its ruling, the water court is afforded wide discretion, which may not be disturbed on appeal absent a showing that its findings and conclusions are so manifestly against the weight of evidence as to compel a contrary result. *Am. Guar. & Liab. Ins. Co. v. King*, 97 P.3d 161, 165 (Colo.App.2003).

We had occasion to address the application of Rule 41(b)(1) in a conditional exchange proceeding in *Public Service Co.* 831 P.2d at 479–80. Like PCSR, plaintiff Public Service argued that it was only required to establish a prima facie case to withstand a Rule 41(b)(1) motion to dismiss. *Id.* at 479. In support of its argument, Public Service cited cases interpreting section 37–92–305(3), C.R.S. (2004). *Id.* Section 37–92–305(3) codifies the standards for granting a change of water right or plan for augmentation. It provides:

> A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. In cases in which a statement of opposition has been filed, the applicant shall provide to the referee or to the water judge, as the case may be, a proposed ruling or decree to prevent such injurious effect in advance of any hearing on the merits of the application, and notice of such proposed ruling or decree shall be provided to all parties who have entered the proceedings. If it is determined that the proposed change or plan as presented in the application and the proposed ruling or decree would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

 We have interpreted this section to establish a framework of burden shifting between applicant and opposers. *See Simpson v. Yale Invs., Inc.*, 886 P.2d 689, 696–97 (Colo.1994). Before an augmentation plan is approved, the applicant bears the initial burden of producing sufficient evidence to establish a prima facie case that the proposed depletion will be non-injurious. *Id.* at 696. If the applicant successfully meets its burden, the objectors bear the burden of providing evidence of injury to existing water rights. *Id.* at 697. Where objectors provide contrary evidence of injury, the applicant has the ultimate burden of showing an absence of

---

**30.** Absent any provision to the contrary, the Rule applies to the 1969 Act. *See Lake Meredith Reservoir Co. v. Amity Mut. Irrigation Co.*, 698 P.2d 1340, 1344 (Colo.1985).

injurious effect by a preponderance of the evidence. *Id.*

In *Public Service Co.,* we noted that this framework anticipates the active participation of objectors in the determination of whether a claimed right will have an injurious effect. 831 P.2d at 480. Consequently, we concluded that the statutory framework was appropriate in a proceeding for a change of water right because the objectors have better access to probative evidence on the issue of injury to vested rights than the applicant. *Id.*

However, we found no basis to apply a prima facie standard or to shift the burden of proof on issues where the applicant has better access to the required evidence. *Id.* Accordingly, because Public Service had better access to the evidence necessary to establish that it had taken the first step towards appropriation, and "can and will" proceed with diligence to complete the appropriation within a reasonable time, the necessary factual predicates for a conditional exchange right decree, we declined to lower Public Service's burden to a prima facie standard. Therefore, contrary to PCSR's assertion, we held that the prima facie standard set forth in 37–92–305(3) *only* applied to the *issue of injury* in a change of water right proceeding. *See id.*

Here, the water right at issue is neither a change of water right nor a conditional exchange right, but an augmentation plan. Augmentation plans are decreed based on the same no-injury analysis that applies in change of water right proceedings. *Simpson v. Yale Invs., Inc.,* 886 P.2d at 696. Accordingly, determining the absence of injury is crucial to the success of an augmentation plan, which shall only be approved "if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." § 37–92–305(3).

However, augmentation plans are subject to additional statutory requirements. *See* § 37–92–305(8), C.R.S. (2004).[31] For example, in reviewing a proposed augmentation plan, a water court must consider the amount and timing of the applicant's depletions, the amount and timing of available replacement water, and the existence of injury to senior appropriators. § 37–92–305(8). Thus, before an applicant can establish an absence of injury to satisfy its prima facie case, it must first establish the timing and location of depletions, as well as the availability of replacement water to prevent injury from those depletions. *See State Eng'r v. Castle Meadows, Inc.,* 856 P.2d 496, 507 (Colo.1993)(court erred in determining the absence of injury where it failed to consider the relationship between the amount and timing of depletions and the amount and timing of replacement water); *Williams v. Midway Ranches Prop. Owners Ass'n., Inc.,* 938 P.2d 515, 522 (Colo. 1997) ("An essential component of an augmentation plan is the provision for adequate replacement water."); *Weibert v. Rothe Bros., Inc.,* 200 Colo. 310, 319, 618 P.2d 1367, 1373 (1980) ("In order to determine the adequacy of the [augmentation plan] to accomplish its intended purpose, it is necessary to consider the adequacy of the replacement water rights."). Whether an augmentation plan will result in material injury to senior appropriators is a factual determination based on the evidence presented in a particular case. *Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.,* 33 P.3d 799, 812 (2001); *Castle Meadows, Inc.,* 856 P.2d at 509.

As discussed above, the water court properly held that PCSR's groundwater and surface water models failed to produce sufficiently reliable results to permit a reasonably accurate determination of the timing, amount, and location of stream depletions or the legal availability of replacement water. Additionally, it is clear that PCSR had better

---

**31.** Section 37–92–305(8) provides in relevant part that:

> In reviewing a proposed plan for augmentation and in considering terms and conditions that may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water that would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right.

access to probative evidence of those elements by virtue of its designing both the models and the augmentation plan.

Hence, the water court correctly held that, in the absence of sufficient proof, it could not determine the issue of injury with respect to PCSR's augmentation plan. Accordingly, we conclude that the water court applied the proper standard of review pursuant to Rule 41(b)(1) in dismissing PCSR's augmentation plan.

### 4. Retained Jurisdiction

This brings us to PCSR's next argument, namely that we should nonetheless reverse the water court's dismissal because the water court improperly ignored the purpose of retained jurisdiction. PCSR contends that the remedy for uncertainty regarding injury that may arise from operating an augmentation plan is retained jurisdiction, not dismissal. PCSR maintains that its proposed twenty-five-year period of retained jurisdiction provides ample opportunity to address uncertainties as required by law.

We hold that the purpose of retained jurisdiction is to address injurious effects that result from the operation of a decreed augmentation plan, and may only be invoked by Opposers after a finding of non-injury by a water court. Because the water court lacked sufficiently reliable evidence to reach the issue of injury, the water court did not have a duty to reconsider injury in retained jurisdiction.

As we discussed above, an applicant must establish absence of injury before the burden shifts to opposers to provide evidence of injury to existing water rights. *Consol. Mut. Water Co.*, 33 P.3d at 811. If opposers present evidence of injury, the ultimate burden of establishing non-injury rests with the applicant. *Id.* at 812. A decree for an augmentation plan can only enter if the applicant meets this burden. *Id.*

Contrary to PCSR's argument, a water court does not have a duty to reconsider injury in retained jurisdiction until after the water court approves an applicant's augmentation plan based upon the no-injury analysis.

§ 37–92–304(6), C.R.S. (2004). Section 37–92–304(6) provides in part:

> Any decision of the water judge ... dealing with a change of water right or a plan for augmentation shall include the condition that *the approval of such change or plan shall be subject to reconsideration* by the water judge *on the question of injury to the vested rights* of others for such period after the entry of such decision as is necessary or desirable to preclude or remedy any such injury

(emphasis added).

Thus, the purpose of retained jurisdiction is to reconsider injury once an augmentation plan is operating, not to prove depletions or prove injury for the first time. Retained jurisdiction cannot substitute for the inherently fact-specific determination of non-injury that occurs during trial based on reliable evidence of the quantity, time, and location of depletions and the legal availability of replacement water.

We held in *Consolidated Mutual Water Co.* that historical consumptive use in support of a change decree must be determined at trial, not proven or reconsidered during retained jurisdiction. 33 P.3d at 812. Similarly, the quantity of depletions and the legal availability of replacement water must be determined at trial as part of the court's injury analysis, not proven during retained jurisdiction.

To find otherwise would be contrary to Colorado policy protecting senior water rights. If PCSR's argument were to prevail, a water court would be unable to deny an application for approval of an augmentation plan at or after trial. The parties involved would have to wait and see if injury occurs under retained jurisdiction, then risk continued depletions if adequate replacement water is not available. Thus, retained jurisdiction is inappropriate in this case.

In sum, the water court properly limited PCSR's scientific evidence at trial to its groundwater and surface water model results. Once the water court determined that this evidence was insufficiently reliable to provide a reasonably accurate determination of injurious depletions or availability of

replacement water, it properly dismissed PCSR's augmentation plan pursuant to Rule 41(b)(1). Because the court never reached the issue of injury, no period of retained jurisdiction was required.

### C. Dismissal of PCSR's Application

■ Having held that the water court properly dismissed PCSR's augmentation plan, we now address whether the water court properly dismissed PCSR's remaining conditional water rights claims based on the failure of its augmentation plan.

■ We begin with the proposition that a conditional right to pump water that would injure senior appropriators may only be decreed in conjunction with an augmentation plan. *Fox v. Div. Eng'r for Water Div. 5*, 810 P.2d 644, 645 (Colo.1991); *Bohn v. Kuiper*, 195 Colo. 17, 19, 575 P.2d 402, 403 (1978). Thus, without an approved augmentation plan, PCSR's claimed conditional right to pump groundwater through 26 proposed wells must fail. Further, because the South Park aquifers are currently saturated, PCSR's underground storage claim depends upon its right to dewater the aquifers. Without a decreed right to pump groundwater from the South Park aquifers, PCSR cannot dewater the aquifers to create the necessary underground storage. Consequently, PCSR's underground storage claim also must fail.[32]

■ PCSR's only remaining claims are for conditional water rights for surface reservoirs and collection systems. To obtain a conditional decree, an applicant must present evidence of an intent to appropriate, in addition to an overt act in furtherance of that intent. *Public Service Co.*, 831 P.2d at 480. Further, the applicant must show that (1) the water can and will be diverted; (2) the water will be beneficially used; and (3) the project will be completed within a reasonable time. § 37–92–305(9)(b), C.R.S. (2004). The applicant bears the burden of proving, by a preponderance of the evidence, that an overt act

has been completed and the appropriation can and will be completed within a reasonable time. *Public Service Co.*, 831 P.2d at 480

Here, the beneficial uses attributed to PCSR's claims are interdependent, and PCSR presented no evidence to the contrary. PCSR presented testimony at trial of its intent to appropriate surface water for delivery to its recharge facilities and eventual storage underground. However, this proposed use failed when the water court dismissed PCSR's underground storage claim because PCSR did not present testimony in support of Aurora's direct use of the water without prior underground storage.

PCSR also claimed absolute and conditional water rights for irrigation, stockwatering, and other uses of water on its lands. However, PCSR failed to provide sufficient evidence to support these claimed appropriations during trial. PCSR's sole claim for absolute uses was for the PCSR Spring No. 4 Collection System. However, although PCSR presented evidence of the location and flow from Spring No. 4, PCSR never determined the amount of water placed to beneficial use from this claimed collection system. Likewise, PCSR failed to present sufficient evidence to support its claimed appropriations for conditional uses on its lands. PCSR presented no evidence regarding the use of surface water rights for local irrigation or other uses. Consequently, PCSR failed to meet the can and will test for these claimed rights.

In sum, PCSR failed to produce evidence at trial sufficient to support a decree for any of its claimed surface appropriations. Thus, the water court properly dismissed PCSR's application for claimed surface water rights.

### III. Attorney Fees

We now turn to the issue of attorney fees. The water court addressed the issue of attorney fees in its order concerning post-trial

---

**32.** PCSR also challenges the water court's holding that water cannot be stored in a saturated aquifer that is tributary to an overappropriated stream system, arguing that the water court created an impossible standard for future conjunc-

tive use projects. Because we find that the dismissal of PCSR's augmentation plan was fatal to its underground storage claim, we do not address the issue in this opinion.

motions, and awarded approximately $1.5 million in attorney fees to Opposers. The fees were awarded for two reasons. First, the water court held that PCSR's application was "groundless" after October 28, 1998, the date on which PCSR knew or should have known, based on the Eastman Memo, that the groundwater model was indefensible at trial.

Second, the court held that PCSR's claims for augmentation credits arising from precipitation, irrigation return flows, and decreases in evapotranspiration losses were frivolous from inception.

### A. Legal Considerations

■ A determination whether to award attorney fees necessarily begins with the American Rule, which precludes an award of attorney fees absent a specific contractual, statutory, or procedural rule providing otherwise. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Buder v. Sartore,* 774 P.2d 1383, 1390 (Colo.1989). Colorado law authorizes the recovery of attorney fees where a party or its attorney brings or defends an action that lacks substantial justification. § 13–17–102(4), C.R.S. (2004). According to the statute, an action lacks substantial justification if it is substantially frivolous, substantially groundless, or substantially vexatious. § 13–17–102(4).

■ An award of attorney fees is an important sanction against an attorney or party who improperly instigates or prolongs litigation. *In re Marriage of Aldrich,* 945 P.2d 1370, 1378 (Colo.1997). The attorney fees statute is designed to prevent burden-some litigation that interferes with the effective administration of justice. § 13–17–101, C.R.S. (2004). However, the statute is not designed to discourage counsel from zealously representing a client, but rather to balance that duty against the important policy of discouraging unnecessary litigation. *W. United Realty, Inc. v. Isaacs,* 679 P.2d 1063, 1069 (Colo.1984).

In deciding whether a claim is substantially groundless or frivolous so as to require an award of attorney fees under section 13–17–102, a court "shall specifically set forth the reasons for said award and shall consider the [statutory[33]] factors, among others." § 13–17–103(1), C.R.S. (2004).

■ Finally, an award of attorney fees will not be disturbed on appeal if supported by the evidence, unless the court abused its discretion in making the award. *Bd. of Comm'rs. v. Eason,* 976 P.2d 271, 273 (Colo. App.1998). To determine whether the water court abused its discretion, we address each of the court's holdings separately.

### B. PCSR's "Groundless" Application

■ A claim is substantially groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial. *W. United Realty, Inc.,* 679 P.2d at 1069. This test assumes that the proponent has a valid legal theory, but offers little in the way of evidence to support the claim or defense. *Id.*

■ Here, at the conclusion of the trial, the water court held under *People v. Shreck,* 22 P.3d 68 (Colo.2001), that PCSR's ground-

---

**33.** These factors, set forth in section 13–17–103(1)(a)–(h) are:

(a) The extent of any effort made to determine the validity of any action or claim before said action or claim was asserted;

(b) The extent of any effort made after the commencement of an action to reduce the number of claims or defenses being asserted or to dismiss claims or defenses found not to be valid within an action;

(c) The availability of facts to assist a party in determining the validity of a claim or defense;

(d) The relative financial positions of the parties involved;

(e) Whether or not the action was prosecuted or defended, in whole or in part, in bad faith;

(f) Whether or not issues of fact determinative of the validity of a party's claim or defense were reasonably in conflict;

(g) The extent to which the party prevailed with respect to the amount of and number of claims in controversy;

(h) The amount and conditions of any offer of judgment or settlement as related to the amount and conditions of the ultimate relief granted by the court.

water model produced insufficiently reliable evidence of depletions.[34] The water court further concluded that PCSR knew or should have known, based on the Eastman Memo, that its model was indefensible at trial. Because PCSR's only proffered evidence in support of its application was its groundwater and surface water models, the water court concluded that PCSR's application was "groundless" from the date of the Eastman memo.

 We disagree. We recognize that a trial court's factual findings are binding unless not supported in the record. *M.D.C./ Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1383–84 (Colo.1994). Here, however, the water court's finding was so clearly erroneous as to not find support in the record.

First, nothing in the Eastman Memo itself supports the water court's finding. Dr. Eastman authored the Eastman Memo and sent it to Burke, PCSR's attorney, on October 28, 1998. The Memo was conspicuously stamped "DRAFT" and contained, in its author's own words, *"proposed* modeling and model related tasks which *would be useful* to both enhance the model and to assist in and perform sensitivity analysis for the model" (emphasis added). Nothing in the Memo indicated that the proposed tasks were necessary for the defensibility of the model.

In addition, in his pre-trial deposition, Eastman testified that he participated in the decision to complete some of the proposed tasks, but not others. He further testified that the necessary tasks had been completed and that PCSR's model was valid. Likewise, at trial, Eastman testified that the model was successful as a predictive tool to a reasonable degree of scientific certainty. Thus, based on the testimony of Eastman and other experts, PCSR had no reason to know of the unreliability of its model until the water court dismissed its application at the end of its case-in-chief.

 In addition, the water court failed to consider that PCSR was entitled to rely on Eastman's opinions, among others, in pursu-

ing its application and in proceeding to trial with its groundwater model. Courts must allow parties and their attorneys to reasonably rely on their experts without fear of punishment for errors in judgment made by those experts. *Coffey v. Healthtrust,* 1 F.3d 1101, 1104 (10th Cir.1993).

In *Coffey,* the plaintiff radiologist filed an antitrust suit against the defendant hospital. *Id.* at 1102. The primary issue in the case was the defendant's relevant market. *Id.* After summary judgment in defendant's favor, plaintiff's attorney obtained newly discovered evidence of a study of the hospital's relevant market that was ostensibly favorable to the plaintiff. *Id.* at 1103. The attorney submitted the study to the court along with an affidavit from plaintiff's expert economist, who was not the author of the study, stating that the study supported plaintiff's position. *Id.*

In response, the defendant submitted affidavits from the study's authors stating that they told plaintiff's attorney that the study did not support plaintiff's position. *Id.* The district court imposed Fed.R.Civ.P. 11 sanctions against plaintiff's attorney, holding that he knowingly filed false and misleading supplemental pleadings. *Id.* The Tenth Circuit Court of Appeals reversed, holding that where reliance is reasonable under the circumstances, a court must allow parties and their attorneys to rely on their experts without fear of punishment for errors in judgment made by the expert. *Id.*

*Coffey* is not directly applicable here because it involves Rule 11, whereas this case involves section 13–17–102. However, the analysis in *Coffey* is indirectly applicable to an award of attorney fees under section 13–17–102 because both Rule 11 and section 13–17–102 have similar purposes; both impose sanctions against a party or its attorney for pursuing groundless or frivolous claims. *Compare* Fed. R. Civ. Pro. 11(b)(1), (3), *and* C.R.C.P. 11, *with* § 13–17–102(4).

Moreover, the rules are not mutually exclusive. Rather, a party may be subject to

---

34. The surface water model results were also insufficiently reliable, but were not a factor in

the court's determination to award fees.

both Rule 11 sanctions and an award of attorney fees pursuant to section 13–17–102. *See Schmidt Const. Co. v. Becker–Johnson Corp.*, 817 P.2d 625, 627 (Colo.App.1991). Accordingly, factors useful in deciding to impose Rule 11 sanctions are also useful in deciding to award attorney fees. *See* § 13–17–103(1) (a court "shall specifically set forth the reasons for said award and shall consider the [statutory] factors, *among others* " (emphasis added)).

In this case, there are more reasons to reverse the award of attorney fees than there were in *Coffey*. First, unlike the expert in *Coffey*, Eastman actually designed and implemented the model in support of which he testified. Furthermore, unlike the plaintiff in *Coffey*, PCSR had five experts testify in support of its groundwater model. So long as PCSR's reliance on its experts was reasonable, it cannot be subject to attorney fees.

Given the highly technical and complex nature of hydrology, as well as the groundwater expertise of PCSR's experts, PCSR's reliance on its experts was reasonable. Consequently, PCSR was entitled to rely on its experts without fear of an award of attorney fees for errors in judgment made by its experts.

In fact, PCSR did not know its model results were insufficiently reliable until the court so concluded in its order dismissing PCSR's application.[35] Accordingly, the water court's reason for awarding attorney fees, namely that PCSR misrepresented that it was prepared for trial even though it purportedly knew its model was insufficient, was not supported by the record, rendering the award of attorney fees an abuse of discretion.

### C. PCSR's "Frivolous" Claims

PCSR proposed to augment its depletions, in part, from water stored in the aquifers by recharge. PCSR claimed precipitation, irrigation run-off, and salvaged water from the loss of surface vegetation as sources for its underground storage.

In its order dismissing PCSR's application, the water court denied PCSR's claims for precipitation and irrigation return flows as violating the requirement that water stored underground must be placed into the aquifer by "other than natural means." § 37–92–103(10.7), C.R.S. (2004).

In its order concerning post-trial motions, the water court also denied PCSR's claims for salvaged water as a violation of Colorado law precluding the use of salvaged water in augmentation plans. § 37–92–103(9), C.R.S. (2004). The water court subsequently held that PCSR's claims for precipitation, irrigation run-off, and salvaged water were frivolous from inception, and awarded the claimed amount of attorney fees.

A claim is substantially frivolous if the proponent can present no rational argument based on the evidence or law in support of that claim or defense. *W. United Realty, Inc.*, 679 P.2d at 1069. Meritorious actions that prove unsuccessful and good faith attempts to extend, modify, or reverse existing law are not frivolous. *Id.* We hold that PCSR's claims for underground storage and augmentation credits from precipitation and irrigation run-off were frivolous from inception. However, we hold that PCSR's claim for salvaged water was a good faith attempt to extend existing law, and was not frivolous from inception.

#### 1. Claims for Precipitation and Irrigation Run–Off

In its augmentation plan, PCSR proposed, among other things, to release water from its underground storage system to replace injurious depletions. As two sources for this stored water, PCSR claimed precipitation and irrigation run-off that "naturally" percolated into the aquifer. Colorado law governing the underground storage of water provides that:

> Waters in underground aquifers are not in storage or stored except to the extent wa-

---

**35.** Typically, where trial is to a jury, a finding that scientific evidence is insufficiently reliable is made in conjunction with a separate hearing concerning the evidence's overall admissibility. *See Shreck*, 22 P.3d at 72. Here, trial was to the judge, who essentially combined the *Shreck* admissibility hearing with PCSR's case-in-chief, thereby reserving judgment on admissibility for a later time.

ters in such aquifers are placed there by other than natural means with water to which the person placing such water in the underground aquifer has a conditional or decreed right.

§ 37–92–103(10.7), C.R.S. (2004). Thus, Colorado law prohibits an underground storage claim for water placed in the aquifer by natural means.

Furthermore, an applicant seeking an underground storage right must first capture, possess, and control water prior to artificially recharging it into the aquifer for storage and subsequent use pursuant to a decreed right. *Bd. of County Com'rs v. Park County Sportsmen's Ranch, LLP*, 45 P.3d 693, 705 (Colo.2002).

Here, PCSR's own evidence established that its storage claims for precipitation and irrigation run-off would naturally percolate into the South Park aquifer. PCSR did not provide evidence of how it intended to capture, possess, or control the precipitation and irrigation return flows naturally percolating into the aquifer prior to recharge. Hence, PCSR presented no rational argument based on the evidence or law in support of its claims for precipitation and irrigation run-off. Therefore, these claims were frivolous from inception, and we affirm the award of attorney fees for these claims.[36]

### 2. Claims for Salvaged Water

 As discussed above, PCSR claimed augmentation credits for salvaged water. Under Colorado law, an applicant may not claim credit for salvaged water in a plan for augmentation. § 37–92–103(9), C.R.S. (2004). There are two exceptions to this rule for unlined gravel pits, § 37–92–305(12)(a), C.R.S. (2004), and on-stream reservoirs, § 37–84–117(5), C.R.S. (2004). Here, PCSR argued that its underground storage facility was analogous to these two exceptions.

Though we declined to extend these exceptions in this case, we hold that PCSR's argument was a good faith attempt to extend existing law. Therefore, PCSR's claim was not frivolous from inception, and we reverse the award of attorney fees.

In sum, we reverse the water court's award of attorney fees to Opposers in its entirety, except for those fees incurred defending PCSR's claims for precipitation and irrigation run-off. Accordingly, we remand to the water court for a determination of these amounts.[37]

### IV. Joinder of Aurora

In a pre-trial order denying partial summary judgment, the water court concluded that PCSR was Aurora's agent-in-fact. Based on this finding, Opposers filed a post-trial motion to join Aurora for a determination of liability for attorney fees. In support of their motion, Opposers argued that because the existence of an agency relationship made Aurora vicariously liable for PCSR's actions, joinder of Aurora was necessary to accord complete relief. The water court agreed, and granted Opposers' motion.

Aurora challenges the water court's decision on two grounds. First, Aurora argues that Colorado law governing attorney fees applies only to "parties" who litigate groundless claims. Aurora contends that because it was not the party litigating the claim, it cannot be held liable for attorney fees. In the alternative, Aurora argues that joinder in this case was procedurally improper.

We conclude that Aurora was vicariously liable for attorney fees because its agent pursued a frivolous claim. We further hold that joinder of Aurora was proper under C.R.C.P. 20 and C.R.C.P. 21. Accordingly, we affirm the water court's order joining Aurora and holding it liable for attorney fees.

---

**36.** PCSR also challenged the award of fees as a violation of due process, arguing that due process requires the water court to conduct a separate evidentiary hearing to determine whether a claim lacks substantial justification where there was no notice of the claim for fees prior to trial. It is clear from the record that there was no evidence or law in support of its claims for precipitation and irrigation run-off, therefore no evidentiary hearing was necessary to determine that the claim lacked substantial justification.

**37.** From the water court's order concerning attorney fees, we are unable to determine which portion of the award corresponds to Opposers' efforts in defending against PCSR's claims for precipitation and irrigation run-off.

## A. PCSR was Aurora's Agent

Agency is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 395 (Colo.1987)(citing Restatement (Second) of Agency § 1(1) (1957)). Agency is a consensual relationship that may, but need not amount to a contract. *City & County of Denver v. Fey Concert Co.*, 960 P.2d 657, 660–61 (Colo.1998). "What is critical is that the parties materially agree to enter into a particular relation to which the law attaches the legal consequences of agency, even though those consequences might not have been within the contemplation of the parties at the time of their agreement." *Stortroen*, 736 P.2d at 395. The existence of an agency relationship is usually a question of fact. *Fey Concert Co.*, 960 P.2d at 661.

Here, an agency relationship existed between Aurora and PCSR. PCSR litigated the application on Aurora's behalf pursuant to the express terms of a contract between Aurora and PCSR.[38] The terms of the contract required PCSR to report to Aurora, to receive instructions from Aurora, and to seek Aurora's approval for settlements and stipulations. Likewise, under the contract, Aurora could terminate the relationship if it believed that PCSR was conducting its agency contrary to the contract. As further evidence of the agency relationship, PCSR filed each of its pleadings in this case with the caption "PCSR, for itself and as agent-in-fact for the City of Aurora."

Accordingly, PCSR was Aurora's agent because Aurora manifested its consent for PCSR to act on its behalf and subject to its control in pursuing water rights for the Project. Therefore, we affirm the water court's agency finding.

## B. Aurora's Vicarious Liability

A principal is vicariously liable for its agent's acts committed within the scope of

the agency. *See Branscum v. Am. Cmty. Mut. Ins. Co.*, 984 P.2d 675, 680 (Colo.App. 1999)("[T]he acts performed or statements by an agent within the scope of real or apparent authority are binding on the principal regardless whether the principal has actual knowledge of the agent's act."). We explained the reasoning behind this rule in *Grease Monkey Int'l Inc. v. Montoya*, 904 P.2d 468, 476 (Colo.1995):

> [F]ew doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own. Our decision recognizes the legal principle that 'when one of two innocent persons must suffer from the acts of a third, he must suffer who put it in the power of the wrongdoer to inflict injury.' This policy motivates organizations to see that their agents abide by the law.

(citations omitted).

This policy also encourages principals to select honest and reliable agents. Moreover, "because the principal enjoys the many benefits of the agency relationship, it is not unfair to require that it also bear the costs of its agent's abuses of authority where they harm innocent third parties." *Willey v. Mayer*, 876 P.2d 1260, 1266 (Colo.1994).

Here, because PCSR is its agent, Aurora is vicariously liable for PCSR's acts committed within the scope of agency. Pursuant to the contract between PCSR and Aurora, PCSR had express authority to "secure ... decreed entitlements to utilize water available under [the Project]." Accordingly, litigating this application was within the scope of the agency relationship.

Further, Aurora's argument that it is not liable under section 13–17–102(4) because it did not actually litigate the application is a red herring. Aurora cannot be allowed to reap the benefits of its agency relationship without accepting the corresponding burdens. *Grease Monkey*, 904 P.2d at 477 (Mullarkey, J., concurring). Aurora is vicariously liable for PCSR's actions whether it is a

---

38. The contract provided that "[PCSR] will act as agent for Aurora's Utility Enterprise in pursuing water adjudications .... The purpose of the agency will be to secure for Aurora and [PCSR] decreed entitlements to utilize water available under [the Project]."

"party" or not by virtue of the agency relationship. Consequently, we affirm the water court's conclusion that Aurora was liable for Opposers' attorney fees.

## C. Joinder of Aurora

■ Because Aurora was vicariously liable for PCSR's litigating a frivolous claim, the water court joined Aurora as a party solely for the purpose of determining liability for attorney fees. Aurora argues that joinder was procedurally improper because C.R.C.P. 20 and 21 do not apply to water court proceedings.[39] We disagree.

The special resume notice provisions of section 37–92–302(3) supplant the traditional procedures for identifying parties and service of process in civil proceedings. *Gardner v. State,* 200 Colo. 221, 224, 614 P.2d 357, 359 (Colo.1980). Consequently, the joinder rules are usually inapplicable to water court proceedings. *See id.* However, joinder of Aurora in this action for the limited purpose of addressing attorney fees was authorized pursuant to C.R.C.P. 20 and 21.

■ Under the Colorado Rules of Civil Procedure, "[p]arties may be dropped or added by order of the court on motion of any party ... *at any stage of the action* and on such terms as are just." C.R.C.P. 21 (emphasis added). Moreover, the Colorado Rules of Procedure authorize joinder in situations where one party seeks to join a person who may be liable for the same debt or conduct that is already before the court:

> All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

C.R.C.P. 20(a). We recognize that the broadest possible reading of C.R.C.P. 20 is desirable. *See Sutterfield v. Dist. Court,* 165 Colo. 225, 231, 438 P.2d 236, 240 (1968); *see also* C.R.C.P. 1(a)(the Rules shall be liberally construed to secure the just, speedy, and inexpensive determination of every action); *Swan v. Zwahlen,* 131 Colo. 184, 188, 280 P.2d 439, 441 (Colo.1955)("The rules indicate clearly a general policy to disregard narrow technicalities and to bring about the final determination of justiciable controversies without undue delay. And that being their purpose, they should be liberally construed.")(quoting *Am. Fid. & Cas. Co. v. All Am. Bus Lines, Inc.,* 190 F.2d 234, 236 (10th Cir.1951)). Whether to join a party is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *King v. W.R. Hall Transp. & Storage Co.,* 641 P.2d 916, 919 (Colo.1982).

Here, Opposers sought to join Aurora as a party solely to determine whether, and to what extent, it was vicariously liable for any attorney fees levied against PCSR. As PCSR's principal, Aurora was potentially liable for conduct that was already before the court. Because C.R.C.P. 20 allows joinder at any stage of the proceedings and because C.R.C.P. 21 anticipates joinder where there are joint liabilities, as well as common questions of law and fact, the water court did not abuse its discretion in joining Aurora.

Nevertheless, Aurora argues that our decision in *Southeastern Colorado Water Conservancy District v. Fort Lyon Canal Co.,* 720 P.2d 133, 142–43 (Colo.1986), precludes joinder in this case. In *Southeastern,* we addressed the issue of whether there could be indispensable objectors to a water court proceeding pursuant to C.R.C.P. 19 where resume notice provided opportunity for interested parties to participate if they so chose. *Id.* This case is distinguishable because Opposers did not seek joinder of Aurora as an

---

**39.** Aurora also argues that joinder was untimely because Opposers were obligated to join Aurora at some earlier stage of the proceedings. This is contrary to C.R.C.P. 21, which provides for joinder "at any stage of the action." More importantly, Aurora's joinder was not required for the water court to declare PCSR's claims groundless and frivolous. Nor was Aurora's participation necessary in the liability finding because it was vicariously liable for PCSR's acts under common law agency principles. However, Aurora's joinder was required in the attorney fee proceeding to prevent prejudice to its rights.

objector or a party to the application. Rather, Opposers sought Aurora's joinder solely to resolve the issue of attorney fees. *Southeastern* does not prohibit joinder under these circumstances. Therefore, we affirm the water court's order granting joinder.

## V. Costs

PCSR asserts two limited challenges to the water court's award of costs to Opposers. First, PCSR contends that Opposers Centennial, Thornton, Denver, and Englewood (collectively "downstream municipal objectors") are not entitled to any costs for work done by groundwater expert Isobel McGowan. Second, PCSR contends that the Center of Colorado Water Conservancy District ("CCWCD") is not entitled to any of the amounts contained in its bill of costs. We disagree.

■■■■ Pursuant to C.R.C.P. 54(d), a prevailing party is entitled to an award of reasonable costs. Section 13–16–122, C.R.S. (2004), sets forth items includable as costs, such as expert witness fees, deposition costs, and any attorney fees authorized by statute or court rule. The list of items is illustrative rather than exclusive. *AWDI*, 874 P.2d 352, 390 (Colo.1994); *Church v. Am. Standard Ins. Co.*, 764 P.2d 405, 406 (Colo.App.1988). Whether to award costs to the prevailing party is a matter within the trial court's discretion and will not be reversed on appeal absent a clear abuse of discretion. *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 684 (Colo. 1994); *Rossmiller v. Romero*, 625 P.2d 1029, 1030 (Colo.1981); *Steele v. Law*, 78 P.3d 1124, 1128 (Colo.App.2003).

Addressing each of PCSR's contentions separately, we hold that the water court did not abuse its discretion in awarding costs to the downstream municipal objectors for McGowan's services, or to CCWCD for its deposition, expert witness, and in-house attorney fees.

**40.** § 12–25–105(1) provides that "[i]t is unlawful for any individual to hold himself or herself out to the public as a professional engineer unless such individual has complied with the provisions contained in this [article]."

**41.** § 12–25–106, C.R.S. (2004).

### A. Isobel McGowan's Costs

■■■ PCSR argues that the downstream municipal objectors are not entitled to any costs for work done by McGowan because she was operating under an expired engineering license in violation of section 12–25–105(1), C.R.S. (2004),[40] while PCSR's application was pending. We disagree.

The downstream municipal objectors retained McGowan, a consulting hydrologist and engineer, to testify as an expert in groundwater modeling, water rights investigations, and groundwater investigations. The water court concluded that McGowan spent the majority of her time in this case reviewing and consulting on documents and technological reports prepared by PCSR as part of its application.

McGowan became a licensed engineer in Colorado in 1989. She remained licensed through 1995, at which point her license expired because she inadvertently failed to pay her biennial dues. She failed to pay her dues because she received no reminder to do so in the mail, having neglected to notify the Board of Registration for Professional Engineers and Professional Land Surveyors (the "Board")[41] of her change of address in 1993. Unaware of the lapse in her licensing, McGowan continued to offer to provide engineering services and continued to list her professional engineering license as a credential on her resume.

In early 2002, after a colleague notified her that her license had expired, McGowan immediately took steps to reinstate her license. The Board reinstated McGowan's license on September 20, 2002, after McGowan paid the necessary dues and reinstatement fee. The Board did not require McGowan to complete additional education or training classes. However, upon hearing that she had offered to provide engineering services while her license was expired, the Board issued a letter of admonition to McGowan, reproving her conduct.[42] Although the Board found that

**42.** Pursuant to § 12–25–108(2)(a), C.R.S. (2004), "[w]hen a complaint or investigation discloses an instance of misconduct that, in the opinion of the board, does not warrant formal action by the board but that should not be dismissed as being without merit, a letter of admonition may be

McGowan had "more likely than not" held herself out as a professional engineer in violation of section 12–25–105(1), it found that her conduct did not require the institution of formal disciplinary proceedings against her license to practice engineering.[43]

PCSR learned of the lapse in McGowan's license in October 2002. In a hearing to the water court, PCSR argued that the downstream municipal objectors were not entitled to costs for McGowan's work because she was operating under an expired engineering license in violation of section 12–25–105. PCSR argued that an award of costs was unconscionable because it violated Colorado law and public policy, and it forced PCSR to compensate an expert for having committed a criminal act.

The water court disagreed, holding that Opposers were entitled to costs for McGowan's work. In reaching this conclusion, the water court noted that (1) the nature of McGowan's work in this matter was review and consultation, for which a valid license was not necessary; (2) that she could have been qualified as an expert for purposes of trial testimony without holding a valid license; (3) that numerous experts involved in the production and analysis of the surface and groundwater models were not licensed as professional engineers; and (4) that McGowan had been licensed in the past, and her failure to renew was an excusable mistake. Thus, the water court held, if the downstream municipal objectors were satisfied with McGowan's work and paid her bill, PCSR was liable whether McGowan was licensed or not.

Based on this record, we hold that the water court did not abuse its discretion in awarding reasonable costs to the downstream municipal objectors for McGowan's services because (1) McGowan did not require an engineering license for her work as an expert; (2) McGowan's lack of license did not

render her services or fees unreasonable; and (3) an award of costs for McGowan's services is not contrary to public policy.

 An expert witness need not hold a valid professional license to present expert testimony on a particular issue. *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 690 (Colo.1998)("There is no requirement that a witness hold a specific degree, training certificate, accreditation, or membership in a professional organization, in order to testify on a particular issue."). Likewise, an expert witness need not hold a valid professional license for work performed in preparation for the rendering of expert testimony. A court may award costs to a prevailing party for an expert witness who does not testify, provided that such costs are reasonable. *Bainbridge, Inc. v. Bd. Of County Comm'rs*, 55 P.3d 271, 274 (Colo.App.2002).

Here, the downstream municipal objectors did not offer McGowan as an expert in professional engineering, and did not represent that her opinions were based on her experience or expertise as a licensed professional engineer. Rather, the downstream municipal objectors offered McGowan as an expert in groundwater modeling, water rights investigations, and groundwater investigations based on her experience and expertise in those fields. Thus, McGowan did not require a professional engineering license to perform work in preparation for her expert testimony on groundwater-related issues.

In fact, other experts involved in the production and analysis of PCSR's surface and groundwater models were not licensed as professional engineers, yet provided many of the same services that McGowan provided. For example, neither Dr. Harvey Eastman nor James L. Jehn, co-authors of the groundwater model and related technological reports, and expert witnesses in PCSR's case-in-chief, were licensed professional engineers.[44] Likewise, Phillipe Martin,

---

issued and sent ... to the professional engineer or engineer-intern."

**43.** Colorado law provides that "[i]f the board has reason to believe that any individual has engaged in, or is in engaging in, any act or practice which constitutes a violation of any provision of this article, the board may initiate proceedings to

determine if such a violation has occurred." § 12–25–109(8)(b)(I), C.R.S. (2004).

**44.** Dr. Eastman became a licensed engineer in February 2000, well after preparing the groundwater model and related reports.

McGowan's colleague in her work for the downstream municipal objectors, was not a licensed professional engineer. Because it was not necessary for these experts to be licensed as professional engineers, and because they provided similar expertise as McGowan, it was not necessary for McGowan to be licensed as a professional engineer to perform review and consultation work for the downstream municipal objectors.

Because McGowan's work as an expert did not require a license, downstream municipal objectors are entitled to the costs for her work to the extent that they are reasonable. There is no evidence that the temporary expiration of McGowan's license rendered her work unreasonable. To the contrary, the evidence shows that the lapsed license affected neither the quality nor the substance of McGowan's work. Rather, McGowan's expertise in groundwater-related issues was independent of her being licensed as a professional engineer. McGowan possessed her expertise by virtue of her qualifications as a consulting hydrologist. These qualifications included a masters degree in hydrology and twenty years of work experience in the field of hydrology, during only seven of which she was licensed as a professional engineer. Neither side disputes these qualifications.

Further, the Board did not require McGowan to complete additional education or training to reinstate her license. This evidence indicates that McGowan was qualified to do the work she did, with or without a professional engineering license, and that such work was reasonable and necessarily incurred by reason of this litigation. Thus, the downstream municipal objectors' costs are reasonable and recoverable under C.R.C.P. 54(d).

Finally, the award of costs for McGowan's services is not contrary to public policy because it is equitable and does not undermine Colorado law regulating the engineering profession. Contracts for services by one who is required by statute to have a license to engage in a particular profession are generally unenforceable. *Carter v. Thompkins*, 133 Colo. 279, 282, 294 P.2d 265, 266 (1956); *Walker Adjustment Bureau v. Wood Bros. Homes*, 41 Colo.App. 26, 30, 582 P.2d 1059,

1063 (1978) *rev'd on other grounds*, 198 Colo. 444, 601 P.2d 1369 (1979). We have applied this rule to prevent an unlicensed person from recovering against the person for whom the services were performed. *Carter*, 133 Colo. at 283–84, 294 P.2d at 267.

However, we do not apply this rule where the services performed did not require a license or where the equities otherwise favor compensation. *Id.* (unlicensed plumber entitled to recover for services and materials used in furnace installation because such installation did not require a licensed plumber); *Walker Adjustment Bureau*, 41 Colo.App. at 30, 582 P.2d at 1063 (" '[T]he technical requirements of the licensing statute play no part in the determination of just claims between persons in the same business field who have contracted with knowledge of each other's respective professional qualifications.' ")(quoting *Kennoy v. Graves*, 300 S.W.2d 568 (Ky.1957)); *see also Pac. Chromalux Div., Emerson Elec. Co. v. Irey*, 787 P.2d 1319, 1326–27 (Utah App.1990) (in awarding compensation to an unlicensed engineer whose claim was otherwise barred by the licensing statute, court considered all the circumstances including whether the party resisting payment was in the class of persons protected by the licensing statute, whether the party resisting payment would unfairly benefit from being relieved of the obligation to pay, and whether the unlicensed status of the person seeking compensation was the result of a good faith mistake).

Here, as discussed above, the services performed by McGowan did not require a professional engineering license. Further, the equities favor McGowan's compensation. For example, the downstream municipal objectors, not PCSR, are among the class of persons intended to be protected by the licensing statute because they contracted directly with McGowan for her services. Thus, the downstream municipal objectors could have chosen not to perform the contract. However, because they were satisfied with McGowan's services and paid her in full, PCSR must compensate them for their costs.

Additionally, the downstream municipal objectors would unfairly benefit if relieved of their obligation to pay McGowan because

their successful challenge to PCSR's application was due in part to McGowan's valuable services, the quality and substance of which were unaffected by her lapsed license. Also, McGowan's lapsed license was the result of an inadvertent, good-faith mistake. She had no intent to defraud either the downstream municipal objectors or PCSR. Finally, an award of costs does not undermine the regulatory power of the Board, which opted not to institute formal disciplinary proceedings against McGowan in favor of sending a letter of admonition. Based on these factors, the water court properly awarded the downstream municipal objectors' costs for McGowan's services.

### B. CCWCD's Bill of Costs

 PCSR argues that the water court's award of costs to CCWCD should be reversed. Without citing to supporting legal authority, PCSR prefaces its argument by asserting that CCWCD's bill of costs is a summary for purposes of CRE 1006. Based on this assertion, PCSR contends that, pursuant to CRE 1006, the originals or duplicates of underlying material supporting the information in the bill of costs must be available for PCSR's examination before the bill of costs may be admitted at a hearing. PCSR argues that because CCWCD allegedly failed to provide it with originals or duplicates of underlying material supporting the bill of costs, the bill of costs should not have been admitted and the award of costs should be reversed. We disagree.

PCSR's argument is contrary to C.R.C.P. 121, section 1–22 and C.R.C.P. 54(d). C.R.C.P. 121, section 1–22 provides that:

A party claiming costs shall file a Bill of Costs within 15 days of the entry of order or judgment .... The Bill of Costs shall itemize and total costs being claimed. Taxing and determination of costs shall be in accordance with C.R.C.P. 54(d) and Practice Standard § 1–15.

Pursuant to C.R.C.P. 54(d), "[c]osts may be taxed by the clerk on one day's notice. On motion served within five days thereafter, the action of the clerk may be reviewed by the court." C.R.C.P. 121, section 1–15 sets forth uniform requirements for motions and is silent on the issue of summaries.

 Although the Rules indicate that a party challenging a bill of costs is entitled to an evidentiary hearing, *Steele v. Law*, 78 P.3d at 1128, the Rules do not mention that a bill of costs must comply with CRE 1006, or that a party seeking costs must provide supporting documentation to the clerk at the time of filing for the costs to be taxed. Rather, we have held that a party seeking costs need only provide the court with sufficient information and supporting documentation to allow a judge to make a reasoned decision for each cost item presented. *See AWDI*, 874 P.2d at 389–90(award of costs upheld where amply supported by billing statements, expert testimony summaries, and testimony concerning the nature and purpose of the services upon which the witness fees were based and the manner by which they were determined); *cf. Fed. Ins. Co. v. Ferrellgas, Inc.*, 961 P.2d 511, 515 (Colo.App. 1997) & *Fenton v. Fibreboard Corp.*, 827 P.2d 564, 569–70 (Colo.App.1991) *aff'd in part and rev'd in part on other grounds* by *Fibreboard Corp. v. Fenton*, 845 P.2d 1168 (Colo. 1993)(award of costs set aside where the party seeking costs did not provide the court with any documentation indicating that the costs requested had been incurred or that they were necessary and reasonable).

In this case, CCWCD filed its itemized bill of costs with the water court in a timely manner pursuant to C.R.C.P. 121, section 1–22(1). In its bill of costs, CCWCD sought reimbursement for thirteen categories of costs, the majority of which were deposition expenses, payments to expert witnesses,[45] and in-house attorney fees.

The record shows that, on June 14, 2002, CCWCD provided copies of invoices and various itemized documents, accounting for $185,062.14 of its requested costs, to PCSR as part of its disclosures for the fees and costs hearing. This supporting documentation was admitted into evidence at the hear-

---

45. CCWCD sought reimbursement for costs paid to PCSR's expert witnesses to reimburse them for time spent during CCWCD depositions, and for costs paid to its own expert witnesses.

ing in the form of testimony from CCWCD's expert witnesses and related exhibits.

For the remaining amounts requested, all of which were for in-house attorney costs, CCWCD presented expert testimony from its attorney, James Culichia. Mr. Culichia's testimony was based upon his personal review of cancelled checks, invoices, and information in the law firm's accounting program. Because Mr. Culichia's expert testimony was independent of CCWCD's itemized bill of costs, and was based on his personal knowledge of his billing statements, the water court ruled that the costs were supported by adequate foundation. Admission of testimony is within the trial court's discretion and may not be reversed on appeal absent an abuse of discretion. *Scott v. Matlack, Inc.,* 39 P.3d 1160, 1170 (Colo.2002). We do not find an abuse of discretion where Mr. Culichia was qualified as an expert, had personal knowledge of the billing procedures, and was subject to cross-examination by PCSR's attorneys. Thus, CCWCD provided the water court with sufficient information and supporting documentation to allow it to make a reasoned decision for each cost item presented. Consequently, we affirm the award of costs in its entirety to CCWCD.

## VI. Conclusion

In conclusion, we affirm the water court's dismissal of PCSR's application for lack of an adequate augmentation plan. Similarly, we affirm the water court's award of reasonable costs to the downstream municipal objectors and CCWCD. With respect to the water court's award of attorney fees, we reverse the award of fees in its entirety, except for those amounts incurred in defending PCSR's frivolous claims for precipitation and irrigation run-off. Because the amount of fees associated with these frivolous claims is not apparent from the water court's order, we remand for a determination of these amounts.