**CITY OF ENGLEWOOD,**
Petitioner–Appellant,

v.

**DENVER WASTE TRANSFER, L.L.C.,**
Respondent–Appellee.

No. 01CA0698.

Colorado Court of Appeals,
Div. V.

Feb. 28, 2002.

Certiorari Denied Oct. 15, 2002.

Weiner, Schiller and May, P.C., Mark E. May, Englewood, Colorado, for Petitioner–Appellant.

Faegre & Benson, L.L.P., Leslie A. Fields, John R. Sperber, Peggy P. Chiu, Denver, Colorado, for Respondent–Appellee.

Opinion by Judge DAVIDSON.

In this eminent domain proceeding, petitioner, the City of Englewood, appeals from the judgment entered by the trial court upon the findings of a commission awarding compensation to respondent, Denver Waste Transfer, L.L.C. (DWT). The City challenges as erroneous the trial court's admission of evidence based on the land residual method of valuation and evidence regarding the City's opposition to DWT's efforts to obtain approval for use of the subject property as a waste transfer station. We affirm.

The subject property was a former landfill adjacent to Centennial Park on the border between the cities of Englewood and Sheridan. In 1998, DWT purchased the property at a price of $802,210 for the purpose of constructing a waste transfer station. The property was zoned for heavy industrial use, and although a waste transfer station was a use by right, additional approval of a planned unit development (PUD) and a solid waste transfer permit was required from the City of Sheridan before that use was permitted.

DWT sought and obtained the necessary land use approvals to construct and operate a waste transfer station. The PUD and permit ran with the land and were nontransferable to other property. The approval process involved multiple public hearings and review by several public agencies over the course of nearly a year. At the public hearings, various officials from the City opposed approval of the PUD.

The City instituted formal condemnation proceedings pursuant to § 38–1–101, et seq., C.R.S.2001, after the PUD and permit approval but before any construction of the waste transfer station. The City intended to use the property as a public park and recreation facility.

Subsequently, a valuation trial was held before a commission of freeholders. DWT's appraisal expert used a comparable sales method to calculate the value of the property without the PUD and permit at $806,200. To calculate the value with the PUD and permit, the expert used a residual method that considers, inter alia, the estimated value of the property as improved and its income-generating potential. Under this method, the value of the property is determined by multiplying the estimated stabilized net operating income by a net income multiplier, to represent the risk associated with such an investment, and then subtracting the cost of improvement and the net present value of the net income loss during start-up. According to the expert, the net income multiplier for the waste management industry ranged from 4.0 to 7.0. Using multipliers of 4.00 and 4.25, the expert calculated final values for the permitted property in the range of $2,055,000 to $2,395,000 and, taking into account certain other factors, reached a final appraisal of $2,175,000.

DWT's expert testified that he had prepared his report under the assumption that there were no comparable sales but that he had subsequently learned of one sale he considered comparable. Using that sale, he calculated a value for the subject property higher than that based on the land residual method. DWT's expert also calculated the ratio of the unpermitted land value to the total value under the land residual method to obtain a multiplier of 2.70, which he described as being at the low end of multipliers for landfill properties, a similar use. The expert testified that these comparisons dem-

onstrated that the residual method was reasonable.

Prior to trial, the trial court had denied the City's motion in limine to exclude testimony on the land residual method, stating:

[T]he Court is unpersuaded that an in limine ruling, excluding the subject evidence, is appropriate, or that the land residual approach is, per se, speculative or misleading or otherwise so flawed as to require its exclusion in advance of trial[,] particularly, in such a fact-intensive trial. The Court determines that it is up to the Commission, basically, to determine how that evidence is to be received and treated, and what weight, if any, is to be accorded.

At trial, the commission also overruled the City's objections to the evidence.

The City's expert appraised the property by using comparable sales of properties with similar industrial zoning but without a PUD or special use permit, and then adding the cost of obtaining the permit to reach a value of $921,000. At the conclusion of the trial, the commission entered a certificate of ascertainment and assessment with a determined value of $1,853,788.

On appeal, the City contends that the trial court and commission erred in admitting land residual valuation evidence because that evidence is speculative, includes the value of unrealized business profits, and violates the undivided basis rule. The City also contends that admission of evidence of the City's involvement in and objections to the PUD approval was error because that evidence is irrelevant, violates the project influence rule, and is unfairly prejudicial. We disagree with each contention.

We first note that the commission appointed by a trial court in an eminent domain proceeding has the authority to make certain evidentiary rulings, and we review such rulings under the same standards applicable to rulings made by a trial court. *See* § 38–1–105(2), C.R.S.2001; *State Dep't of Highways v. Mahaffey*, 697 P.2d 773 (Colo.App.1984); *City of Aurora v. Webb*, 41 Colo.App. 11, 585 P.2d 288 (1978).

## I.

The City contends that the land residual method should be rejected as a matter of law. The City argues that valuation evidence using that method is inadmissible because it relies on hypothetical improvements that do not yet exist; such reliance assumes that the proposed development is an accomplished fact in violation of *Department of Highways v. Schulhoff*, 167 Colo. 72, 445 P.2d 402 (1968), and renders the method too speculative; and such methods have been rejected previously by Colorado courts. Alternatively, the City argues that use of such a method is not permissible under the circumstances.

## A.

■ The City contends that the valuation evidence using the land residual method should have been rejected in favor of the comparable sales method. We disagree.

When taking property by eminent domain, the condemnor must pay "just compensation" for the property, which is the "present reasonable market value" of the property in light of the property's "highest and best use." *See* Colo. Const. art. II, § 15; § 38–1–101, C.R.S.2001; *City of Aurora v. Webb, supra*, 41 Colo.App. at 14, 585 P.2d at 291.

■ "The commission is entitled to consider any competent evidence, apart from certain factors arising from the very fact of condemnation, which would be considered by a prospective seller or buyer as tending to affect the present market value of the land." *Goldstein v. Denver Urban Renewal Auth.*, 192 Colo. 422, 425, 560 P.2d 80, 83 (1977). The admissibility of evidence regarding property value is governed by an expansive, rather than restrictive, rule. *City of Westminster v. Jefferson Ctr. Assocs.*, 958 P.2d 495 (Colo.App.1997).

■ The three common approaches to valuing real estate are the market approach (based on comparable sales), the cost approach (cost of construction or reproduction less depreciation), and the capitalization of income approach. *Denver Urban Renewal Auth. v. Berglund–Cherne Co.*, 193 Colo. 562, 568 P.2d 478 (1977). One or more of these approaches may be inapplicable in a given

case. *Cf. 501 S. Cherry Joint Venture v. Arapahoe County Bd. of Equalization*, 817 P.2d 583 (Colo.App.1991)(valuation for purposes of property tax assessment).

■ In limited circumstances, other methods of valuation are permitted to calculate the value of property taken. *See Denver Urban Renewal Auth. v. Pogzeba*, 38 Colo. App. 168, 558 P.2d 442 (1976). One such circumstance is a lack of sufficient comparable sales. When the market value of property is uncertain, evidence regarding value for specific purposes is admissible in addition to evidence regarding the proposed use. *Denver & R.G.R.R. v. Griffith*, 17 Colo. 598, 31 P. 171 (1892).

> In condemnation cases, market value is usually established by sales of like property. It does not follow, however, that the owner is precluded from proving value when there have been no comparable sales. In such cases resort may be had to best available data which, even though speculative, under some circumstances may be sufficient to allow a jury to make an informed estimate of value.

*United States v. Sowards*, 339 F.2d 401, 402 (10th Cir.1964). *See also Bd. of County Comm'rs v. Vail Assocs., Ltd.*, 171 Colo. 381, 468 P.2d 842 (1970); *Dandrea v. Bd. of County Comm'rs*, 144 Colo. 343, 356 P.2d 893 (1960). In appropriate cases, "the fact that some speculation is required does not defeat the admissibility of the evidence but rather relates to the weight to be given to that evidence." *State Dep't of Highways v. Mahaffey, supra*, 697 P.2d at 776 (hypothetical income from future gravel extraction admissible). *See also* Julius L. Sackman, *Nichols on Eminent Domain* § 19.06[6] (3d ed. 2001)("Where property is so unique as to make unavailable any comparable sales data, evidence of income has been accepted as a measure of value.").

DWT's appraisal experts testified that there were not sufficient comparable sales and that, in the absence of such sales, the only way to calculate the added value of the permit and PUD was to use the land residual method.

■ The land residual method is a variant of the income capitalization method and is useful in certain circumstances:

> The land residual technique may also be used to estimate land value when sales data on similar parcels of vacant land are lacking.... The land residual technique can be used to estimate land value when 1) building value is known or can be accurately estimated, 2) stabilized, annual net operating income to the property is known or estimable, and 3) both building and land capitalization rates can be extracted from the market.... The land residual technique is useful when comparable sales are lacking and as a check on the sales comparison approach.

American Institute of Real Estate Appraisers, *Appraisal of Real Estate* ch. 13, at 306–307 (9th ed. 1987). Whether a comparable sale is sufficiently similar to be of probative value in determining the value of the land taken is for the trial court or commission to determine in its discretion. The commission also determines what weight, if any, is to be given to comparable sales. *City of Westminster v. Jefferson Ctr. Assocs., supra*.

The parties disagreed as to whether comparable sales existed and what type of properties should be compared. DWT's appraisal experts testified that vacant industrial properties with PUD and permit approval for a waste transfer station were the appropriate comparable. They could find only one such comparable sale, which provided a value higher than that obtained using the land residual method. The City's appraisal expert used as comparable sales industrial property that did not have an approved PUD and permit, arguing that the added value of the PUD should be calculated based solely on the amount expended to obtain it, which he estimated as $50,000. The City's expert did not offer any comparable sales involving a PUD and permit and indicated that the only instance of the rental value of a waste transfer station that was found did not reflect a market rental rate.

However, despite the testimony that the value added by the PUD and permit should be limited to its cost, so that ordinary industrial properties were appropriate compara-

bles, the City's appraisal expert also indicated that the PUD and permit added value in addition to their cost. He specifically agreed that the PUD and permit increased the value of the property and acknowledged that DWT's efforts to obtain PUD approval for a waste transfer station "advanced it from raw land toward a finished site," and that "when you go into the marketplace and compare it to other finished sites, it would be important to keep that as one aspect." He also noted that if an investor improves property to make it attractive in the marketplace, he will be rewarded at each stage of development "not only for the costs he's incurred, but rewarded for what's called entrepreneurial profit." While not agreeing that the PUD and permit were extremely difficult to obtain, that expert acknowledged that a six- to eight-month process involving five public meetings with public opposition would not be atypical and that approval was not a certainty because the site plan itself and all the requirements imposed by the land use authority would have to be met before receiving approval.

Considering both parties' expert testimony, we conclude that there is sufficient evidence in the record to support DWT's position that there were not sufficient comparable sales.

Accordingly, we also conclude that the record supports a finding that the criteria outlined by the American Institute of Real Estate Appraisers for use of the land residual method were met. Not only was there evidence of insufficient comparable sales, but also the cost of the waste transfer station could be estimated based on the requirements specified in the PUD, and the stabilized annual net operating income could also be estimated. While each side came up with different figures, each was able to estimate the operating income and costs with some factual foundation. Finally, there was testimony that the multiplier (the inverse of a capitalization rate) was extracted from the market as that used in the solid waste industry. We also note that, based on the evidence, the commission could have accepted the comparable sale offered by DWT's ex-

perts, which yielded a higher market value than the land residual method.

### B.

■ The City contends, however, that as used here, the land residual valuation method impermissibly considers a speculative or prospective value because there was no waste transfer station in existence. We disagree.

■ Any reasonable future use may be considered to assist the commission in determining the present value of the property:

> The owner is entitled to have considered the most advantageous use in the future to which the land may be reasonably applied, not with the view of allowing him for [sic] speculative or prospective damages or values, but only as such evidence may bear upon or affect or assist in arriving at the present market value.

*Wassenich v. City & County of Denver*, 67 Colo. 456, 466, 186 P. 533, 537 (1919). "[M]erely possible or imaginary uses or speculative schemes of its proprietor are to be excluded." *Twin Lakes Hydraulic Gold Mining Syndicate, Ltd. v. Colorado Midland Ry.*, 16 Colo. 1, 5, 27 P. 258, 260 (1891). The likelihood of rezoning to accommodate a particular proposed use may be considered if it rises to the level of a probability and would be reflected in present market value. *State Dep't of Highways v. Ogden*, 638 P.2d 832 (Colo.App.1981).

Here, the property had the PUD and permit for use as a waste transfer station and did not require rezoning. Moreover, experts on both sides testified that the highest and best use of the property was for industrial purposes, including use as a waste transfer station, which thus was a feasible use. *Cf. Denver Joint Stock Land Bank v. Bd. of County Comm'rs*, 105 Colo. 366, 371, 98 P.2d 283, 286 (1940)("no evidence ... that there was or would within a reasonable future be a demand for a subdivision of this land into small farms"); *Union Exploration Co. v. Moffat Tunnel Improvement Dist.*, 104 Colo. 109, 122, 89 P.2d 257, 263 (1939)("no active or competitive demand for the land for a tunnel site"). Thus it was proper for the commis-

sion to determine the value of the property for use as a waste transfer station even though no such facility then existed.

Nevertheless, the City contends that Colorado has rejected valuation based on the hypothetical operation of a nonexistent business to establish damages to an interest in land and cites as authority *Western Cities Broadcasting, Inc. v. Schueller*, 849 P.2d 44 (Colo.1993). However, the evidence of the business value in *Western Cities* was rejected because there was no evidence that linked the business value to the value of the leasehold at stake. Here, however, DWT's land residual method linked the value of the proposed business to the value of the vacant property by, inter alia, subtracting elements of business value and using multipliers used in the waste management industry to value property based on income.

Moreover, property valuation based on a hypothetical income stream from a business that was not yet in operation has been accepted in similar situations when the evidence is sufficiently specific to allow an appraiser to make reasonable and informed decisions as to value. *See State Dep't of Highways v. Mahaffey, supra.* Here, the estimates for the costs and revenues of a waste transfer station on the property were not purely theoretical, but were based on another operating facility in Denver owned by a principal of DWT.

Nor, contrary to the City's contention, does DWT's approach violate the rule of *Department of Highways v. Schulhoff, supra,* that property may not be valued under the assumption that the proposed future use is an accomplished fact.

In *Schulhoff,* a parcel of vacant land was taken, and the parties agreed that the highest and best use of the property was for subdivision into residential building sites. The supreme court rejected a valuation method that estimated the number of building sites and their value and then added those values together because the cost of development was too speculative. The court held that the value should be based on what a willing purchaser would pay for the whole tract, rather than what individuals would pay for developed parcels.

However, the court noted that when a developer determined the value that it could afford to pay for the whole parcel, the developer would consider "the chances and probabilities of the situation" and that a commission should consider the same factors. *Dep't of Highways v. Schulhoff, supra,* 167 Colo. at 78, 445 P.2d at 405. *Cf.* § 39–1–103(14)(b), C.R.S.2001 (cost of development to be taken into account when determining actual value of vacant land for assessment purposes). Here, there was testimony that a purchaser would consider the potential profits to be made from a waste transfer station when calculating the market value of property with an existing permit and PUD for that use.

Moreover, in *Board of County Commissioners v. Vail Associates, Ltd., supra,* the supreme court acknowledged that when, as here, there are insufficient comparable sales of undeveloped land, valuation based on sales of subdivided sites may be necessary. *See also Bd. of County Comm'rs v. Evergreen, Inc.,* 35 Colo.App. 171, 532 P.2d 777 (1974)(*Schulhoff* rule applies only to raw land and not to property that has been platted and developed).

### C.

The City next contends that income and profits from a waste transfer station would be attributable solely to the business and not to the land and therefore could not be considered in valuing the land. The City argues that DWT's valuation includes compensation for business value and lost opportunity. We disagree.

Generally, evidence of profits from a business conducted on the property is not admissible to determine the market value of the property unless it is "profits derived from the land itself" rather than "profits derived from a business conducted on the premises." Such evidence is excluded because the business itself is not being taken, but can be relocated to another property, and the financial success of a business is often tied to factors that are not tied to the use of the land. *Denver Urban Renewal Auth. v. Berglund–Cherne Co., supra,* 193 Colo. at 567, 568 P.2d at 482. *See also City & Coun-*

ty of Denver v. Hinsey, 177 Colo. 178, 182, 493 P.2d 348, 351 (1972) (considerations such as past and future earning capacity and lost profits "standing alone and without competent evidence of market value are inadmissible"). *But see Nichols on Eminent Domain, supra,* § 19.06[1] ("It has nevertheless been held that evidence of the volume of business may properly be admitted for consideration on the issue of fair market value and rental value of the premises condemned where, by accepted standards and criteria in the trade or business, rentals and values of such property are based thereon.").

 Similarly, elements of business value and lost profits are generally not recoverable as part of the just compensation due when property is taken by eminent domain. *City & County of Denver v. Hinsey, supra.*

Here, however, DWT was not seeking to be compensated for lost profits and an unbuilt facility, but rather using the estimated profits as a factor in calculating the amount a willing purchaser would pay for the property with a PUD and permit. DWT's experts testified that the method they used removed the projected value of the improvements and profits from their calculations of value. *Cf. Waste Management v. Kenosha County Bd. of Review,* 184 Wis.2d 541, 516 N.W.2d 695 (1994). While the City's experts challenged the extent to which these factors were completely removed, the credibility of the experts and the weight to be given their testimony was for the commission to judge. *See State Dep't of Highways v. Mahaffey, supra.*

Moreover, nontraditional appraisal methods were appropriate here because, as discussed, DWT demonstrated a lack of comparable sales. And, although we need not decide whether income from a waste transfer station would be "profits derived from the land itself," we note that the PUD and permit for a waste transfer station were nontransferable and ran with the subject property. They could not simply be moved to another location and were, at least to some degree, tied to the land.

### D.

 The City also contends that use of the land residual valuation method violates the undivided basis rule because it involves separate valuations of the waste transfer business and of the land. Again, we disagree.

 The undivided basis rule is applicable when there are multiple owners of different interests in the subject property, and it requires that the separate interests be valued as an aggregate. The condemnor is then released, and the owners of the various interests subsequently apportion the proceeds among themselves. *See Montgomery Ward & Co. v. City of Sterling,* 185 Colo. 238, 523 P.2d 465 (1974). Here, however, DWT owned a single fee simple interest, and there was no attempt to value that interest separate from any lesser interest, such as a leasehold.

 Moreover, while separate awards are not permissible, where it is established that improvements or appurtenant rights enhance the value of property, evidence of the separate values of the land and appurtenant rights is admissible. *City of Gunnison v. McCabe Hereford Ranch, Inc.,* 702 P.2d 768 (Colo.App.1985). Here, the experts agreed that the PUD and permit for a waste transfer station increased the value of the property. The evidence regarding the proposed facility was introduced as part of the calculation of the value of the permitted land and not for purposes of compensation for the proposed facility. Thus, to the extent that evidence of separate values for the land and the permit was introduced, such evidence was admissible.

### IV.

 Prior to trial, the trial court denied the City's motion to exclude evidence regarding the City's efforts to oppose the PUD application, finding that it was relevant to valuation, timeline, and credibility issues, and that it was not unfairly prejudicial under CRE 403. The commission admitted the evidence at trial, but only for limited purposes. It determined that the evidence was admissible as background on the issuance of the permit, the steps necessary to obtain it, and the timeline of the process, but also deter-

mined that evidence of the City's motivation for opposing the PUD was prejudicial and irrelevant.

The City contends that this evidence should have been excluded because it violates the project influence doctrine by including valuation amounts arising from the fact of the acquisition itself and that, in any event, it is irrelevant to the valuation issue and prejudicial. We disagree.

When determining just compensation for eminent domain purposes, any change in the value of the property attributable to the effects of the condemnation and proposed public use may not be considered. *Williams v. City & County of Denver*, 147 Colo. 195, 363 P.2d 171 (1961); *City of Boulder v. Fowler Irrevocable Trust 1992–1*, 53 P.3d 725, 2002 WL 5531 (Colo.App. No. 01CA0224, Jan. 3, 2002).

Here, however, even if the City's opposition to the PUD application were a part of its eminent domain plan to enlarge Centennial Park, those actions and the plan itself did not have any effect on the value of the property after the PUD and permit were ultimately issued by the City of Sheridan. While DWT argued that a PUD and permit added significant value because of the difficulty of obtaining approval, the asserted difficulty was the public opposition and not the actions of the City. Thus, the project did not have any influence on the value of the property, and the evidence should not have been excluded on the basis of project influence.

While the parties agreed that the PUD and permit approval added value to the property, they sharply disagreed as to the amount of added value. The City asserted that PUD and permit approval could be obtained on other similarly zoned property and that the added value should be limited to the cost of obtaining the approval. DWT, however, asserted that the approval process was very difficult and involved significant risk, such that approval added significant value to the property. Regarding the feasibility of the intended use as a waste transfer station, the parties also disagreed on the extent to which certain environmental concerns were addressed in the PUD process. We therefore agree that the nature and extent of the PUD proceedings were relevant to the valuation issue.

A ruling on the admissibility of evidence under CRE 403 is reviewed under an abuse of discretion standard, and the reviewing court is to attribute to the evidence the maximum probative value and minimum unfair prejudice. *Bonser v. Shainholtz*, 3 P.3d 422 (Colo.2000). Here, the evidence of the City's involvement was intertwined with the PUD process itself and the issues raised therein. Moreover, the commission minimized any prejudicial effects by excluding testimony regarding the City's motives in opposing the PUD. Thus, we conclude that the commission did not abuse its discretion in admitting the evidence.

The judgment is affirmed.

Judge CASEBOLT and Judge NIETO concur.