COLORADO COURT OF APPEALS                          2017COA83

Court of Appeals No. 15CA1951
Weld County District Court No. 14CV30182
Honorable Julie C. Hoskins, Judge

_____

Board of County Commissioners of the County of Weld, a political subdivision
of the State of Colorado,

Petitioner-Appellee,

v.

DPG Farms, LLC,

Respondent-Appellant.

_____

JUDGMENT AND ORDER AFFIRMED

Division II
Opinion by JUDGE HARRIS
Dailey and Márquez*, JJ., concur

Announced June 15, 2017

_____

Bruce Barker, County Attorney, Bob Choate, Assistant County Attorney,
Greeley, Colorado; Hamre, Rodriguez, Ostrander & Dingess, P.C., Donald M.
Ostrander, Joel M. Spector, Denver, Colorado, for Petitioner-Appellee

Robinson Waters & O'Dorisio, P.C., Richard D. Judd, Brian A. Magoon, Jena R.
Akin, Denver, Colorado, for Respondent-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1     In this condemnation action, respondent, DPG Farms, LLC

(DPG), appeals from a judgment entered on a jury verdict after a

valuation trial.  The issue on appeal concerns the proper method for

determining compensation when the condemned property, and

portions of the remainder, are capable of producing income.

¶ 2     DPG argues that the district court erred in (1) determining as

a matter of law that water storage was not the highest and best use

of the property; (2) excluding its lost income evidence which, it says,

was admissible under its income capitalization approach to valuing

the affected property; and (3) denying a substantial portion of its

request for costs.  We affirm.

## I.     Background

¶ 3     Petitioner, the Board of County Commissioners of Weld

County (the County), filed a petition in condemnation to extend a

public road over 19 acres[1] of DPG's 760-acre property (the

Property).  When condemnation proceedings were initiated, the

---

[1] The condemned property included 16.96 acres in fee, 2.04 acres in permanent easements, and 2 temporary construction easements. The nature of land interests conveyed to the County is not at issue in this case, and there is no dispute regarding the value of the easements.

1

Property was used primarily for agricultural and recreational purposes.

¶ 4 The parties stipulated to the County's immediate possession of the nineteen acres and proceeded to a valuation trial.[2] DPG's valuation encompassed two steps: (1) determining the highest and best use of the Property; and (2) in light of that determination, calculating the fair market value of the condemned property as well as any diminution in fair market value to the residue.

¶ 5 According to DPG's experts, the highest and best use of the Property was mixed: portions of the Property were most advantageous for continued agricultural and recreational use, while other portions had the potential for gravel mining and subsequent water storage.

¶ 6 Specifically, approximately 280 acres of the Property contained gravel deposits. DPG's experts testified that those acres could be mined over a period of time and then repurposed for water storage. The evidence of the feasibility of mining and water storage was set forth in a detailed development plan (the mining plan). The mining

_____

[2] Before filing the petition, the County paid DPG $148,719, the amount the County estimated as just compensation for the nineteen acres.

plan split the 280 minable acres into four areas — referred to as "cells" — located in a horizontal line across the Property. The nineteen-acre strip condemned by the County ran through Cell C.

¶ 7    DPG's method of valuation proceeded as follows: first, it used primarily a comparable sales approach to calculate the pre-condemnation fair market value of the Property. DPG's appraiser relied on six similar properties (though only two had potential for mining and water storage) to arrive at a per-acre value of $11,500, or $8.74 million for the entire 760-acre Property. The gravel mining expert, who was not an appraiser but had substantial experience buying and selling properties with mining potential, used a similar approach. He testified that, at the time of the condemnation, taking into account the expenses and losses inherent in gravel mining, a willing buyer would have paid approximately $5,000 per non-income-producing (agricultural) acre, and $10,000 per income-producing (mining) acre, or a total of $5.2 million for the Property. The County's own appraiser ultimately endorsed the mining expert's pre-condemnation, fair market value of the Property.

¶ 8    Next, to calculate the loss in value to the Property caused by the condemnation, DPG switched to what it calls an income approach.  But rather than calculating a post-condemnation fair market value of the Property (that could be compared with the pre-condemnation value, as calculated by the appraiser and mining expert), DPG used its mining plan to compute the total income that could have been generated from the nineteen-acre strip ($1 million), as well as from a twenty-seven-acre portion of Cell C affected by the condemnation ($2.1 million).  It then attempted to present the $3.1 million loss figure as its compensable damages.

¶ 9    The district court excluded only the ultimate loss figure, concluding that without any evidence of that figure's connection to the Property's fair market value, the figure amounted to inadmissible frustration-of-plan damages.  In light of the court's ruling, DPG presented an alternative damages figure: the appraiser, using his $11,500 per-acre fair market value figure, testified that the Property's value decreased by $550,000 — the value of the approximately forty-six acres (plus the easements) that were either condemned or damaged by the condemnation.

¶ 10    The jury awarded DPG $183,795 in damages for the condemned property[3] and nothing for any damage to the residue.

¶ 11    DPG filed a post-trial motion to recover its costs, as permitted by statute.  It sought $248,680.92, much of which was attributable to expert witness fees.  The district court rejected a substantial portion of the requested costs on the grounds that the costs were disproportionate to DPG's success and that certain expert evidence had been excluded.  The court awarded costs in the amount of $68,808.96.

## II.    DPG's Contentions on Appeal

¶ 12    On appeal, DPG contends that the district court erred in rejecting water storage as the highest and best use of certain portions of the Property and in excluding its lost income evidence. DPG also argues that the court erred in disallowing a significant portion of its costs.

---

[3] The nineteen-acre condemned strip consisted of seven-and-a-half minable acres and eleven-and-a-half non-minable acres.  The value of the easements was $14,500.  DPG's appraiser valued the condemned strip at $233,000 ($11,500 per acre X 19 acres + $14,500).  DPG's mining expert valued the strip at $147,000 ($10,000 X 7.5 + $5000 X 11.5 + $14,500).  The jury's award of approximately $184,000 is close to the mid-point between the two numbers.

## A. Highest and Best Use of the Property

¶ 13 The measure of compensation in an eminent domain case turns on the value of the entire property as it exists at the time of the condemnation, "taking into consideration its highest and best future use." *Bd. of Cty. Comm'rs v. Vail Assocs.*, 171 Colo. 381, 389, 468 P.2d 842, 846 (1970). Under this principle, the property's value is based on the most advantageous use to which the property reasonably may be applied and is not limited to its current condition. *Dep't of Highways v. Schulhoff*, 167 Colo. 72, 77-78, 445 P.2d 402, 405 (1968); *see, e.g.*, *State Dep't of Highways v. Mahaffey*, 697 P.2d 773, 775-76 (Colo. App. 1984) (highest and best use of property was gravel mining despite land currently being vacant and undeveloped). The four factors to be used in determining a property's highest and best use are legal permissibility, physical possibility, financial feasibility, and maximal productivity. *See* Appraisal Institute, *The Appraisal of Real Estate* 280 (14th ed. 2013).

¶ 14 Although the admissibility of evidence regarding property value is "governed by an expansive, rather than restrictive, rule," *City of Englewood v. Denver Waste Transfer*, 55 P.3d 191, 195 (Colo.

App. 2002), a district court will not consider evidence of a property's highest and best use that is overly speculative, *Schulhoff*, 167 Colo. at 75, 445 P.2d at 404.

¶ 15    Most of the Property's 760 acres could only be used for agricultural or recreational purposes. The dispute between the parties centered on the highest and best use of 280 acres of the Property, comprising cells A, B, C, and D, which contained gravel deposits. The district court determined that the highest and best use of those acres was gravel mining, but not water storage as well.

¶ 16    The determination of a property's highest and best use is generally a factual question for the jury unless the evidence of highest and best use is so improbable or speculative that it should be excluded from the jury as a matter of law. *City of Quincy v. Diamond Constr. Co.*, 762 N.E.2d 710, 715 (Ill. App. Ct. 2002); *cf. Bd. of Cty. Comm'rs v. Rodgers*, 2015 CO 56, ¶¶ 13, 15-17 (explaining that, after presentation of evidence, if the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party as a matter of law).

¶ 17    After DPG's experts testified about the Property's highest and best use, the district court determined, as a matter of law, that the evidence was too speculative to support a finding that water storage was the highest and best use of Cell C.[4]  We review that legal conclusion de novo.  *See E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo. 2000).

¶ 18    The district court's determination was based on the following evidence:

- The construction of a slurry wall was integral to DPG's water storage plan.  (A slurry wall is a reinforced, concrete wall structure that lines a mining pit and provides a barrier for water storage.)  According to DPG's engineering expert, construction becomes more difficult and risky as the depth of the slurry wall increases.  An irregular bottom and porous materials also make construction more difficult, and these elements were present in Cell C.

---

[4] The highest and best use evidence submitted by DPG focused on Cell C.

8

- The slurry wall would have to be built approximately 108 feet deep, possibly 116 feet deep. DPG's engineering expert testified that he thought a 108-foot wall was possible, but that the deepest slurry wall he had experience with was 55 feet deep.

- The usual installation cost for a slurry wall is $3 million to $5 million, but because of the bedrock depth, the nature of the soil and other underground materials, and the additional equipment necessary for construction, the cost of a slurry wall in Cell C was estimated at almost $14 million.

- Although DPG had an estimate for the cost of the slurry wall, the experts' analysis was so preliminary that they did not know at the time of trial whether it was feasible to construct a slurry wall at all. For example, DPG's experts had drilled four boreholes to determine the soil conditions in Cell C, but DPG would not know whether Cell C was suitable for a slurry wall until after its experts drilled an additional eighteen boreholes and analyzed the results. DPG's engineering expert acknowledged that the

9

outcome of any further investigation could change his opinions.

- DPG's geologist acknowledged that the experts did not have sufficient information to determine whether water storage on Cell C would be a "good idea" even though it might be "possible."

¶ 19     We conclude that the district court did not err in determining, as a matter of law, that the evidence was too speculative to support a jury finding that water storage was the highest and best use of Cell C. *See Denver Waste Transfer*, 55 P.3d at 197 (Valuation depends on the "reasonable" future use of the property, but "merely possible or imaginary uses or speculative schemes of its proprietor are to be excluded.") (alteration omitted) (quoting *Twin Lakes Hydraulic Gold Mining Syndicate, Ltd. v. Colo. Midland Ry.*, 16 Colo. 1, 5, 27 P. 258, 260 (1891)).

B.     Exclusion of DPG's Lost Income Evidence

¶ 20     The district court allowed DPG's appraiser and mining expert to testify, consistent with DPG's mining plan, that gravel mining of

Cell C would generate income.[5]  That evidence was admissible, the court ruled, because it was relevant to determining the Property's fair market value.  But when DPG attempted to introduce the lost income figures as the actual amount of compensation due, the court excluded that evidence.  It reasoned that, on their own and unconnected to a fair market valuation of the Property, the lost income figures amounted to a request for damages based on the frustration of a hypothetical development plan, a type of compensation barred in eminent domain cases.

¶ 21    On appeal, DPG insists that evidence of lost income was admissible pursuant to an income capitalization approach to valuing the Property.  We disagree.

1.    Valuation Methods in Eminent Domain Cases

¶ 22    In an eminent domain case, the landowner is entitled to be reimbursed for both the value of the condemned property and the reduced value of the remaining property.

¶ 23    The amount of compensation owed for the condemned property is "measured by the actual fair market value of the

_____

[5] The mining plan contemplated gravel mining of cells A, B, and D, but did not include specific income figures for those cells.

11

property" at the time of the taking. *Palizzi v. City of Brighton*, 228 P.3d 957, 962 (Colo. 2010); *see also Denver Waste Transfer*, 55 P.3d at 195 (Just compensation is the "present reasonable market value" of the property in light of its "highest and best use."). Fair market value is what a willing buyer would pay for the property if the owner had voluntarily offered it for sale. *Palizzi*, 228 P.3d at 962; *see also* CJI-Civ. 36:3 (2017) ("'Reasonable market value' means the fair, actual, cash market value of the property. It is the price the property could have been sold for on the open market under the usual and ordinary circumstances . . . .").

¶ 24 Compensation for damage to the remainder of the property is measured by the difference in the fair market value of the residue immediately before and immediately after the taking. 4A Julius L. Sackman et al., Nichols on Eminent Domain § 14.02(3) (3d ed. 2015; *see also Wassenich v. City & Cty. of Denver*, 67 Colo. 456, 466-67, 186 P. 533, 537 (1919).

¶ 25 There are three general approaches to establishing the fair market value of real estate: the comparable sales approach, the income approach, and the cost approach. *Mahaffey*, 697 P.2d at 775. Only the first two methods are relevant here.

12

¶ 26     The comparable sales approach aims to identify sufficiently similar properties — in size, use or development, or location —to arrive at a reasonable estimate of the fair market value of the condemned property.  *See Goldstein v. Denver Urban Renewal Auth.*, 192 Colo. 422, 426, 560 P.2d 80, 84 (1977).

¶ 27     The income approach values the property based on projections of the "net income generated by the property during the remainder of its productive life."  *Denver Urban Renewal Auth. v. Berglund-Cherne Co.*, 193 Colo. 562, 565-66, 568 P.2d 478, 480 (1977). Under this approach, an appraiser analyzes a property's capacity to generate benefits, usually an income stream, and then, using various techniques and mathematical procedures, "convert[s] these benefits into an indication of present value."  Appraisal Institute at 445.  "Overall, the income approach converts the income that the real estate is expected to generate into a factor that a reasonable buyer or seller would consider in determining fair market value." *W. Va. Dep't of Transp. v. W. Pocahontas Props., L.P.*, 777 S.E.2d 619, 639 (W. Va. 2015).

¶ 28     The goal of both methods is to determine just compensation based on the impact of the condemnation on the present,

reasonable market value of the property. *Jagow v. E-470 Pub. Highway Auth.*, 49 P.3d 1151, 1157 (Colo. 2002); *see also* Appraisal Institute at 439. And, if performed correctly, the comparable sales and income approach calculations should result in similar fair market valuations for the same property, providing further assurances to the appraiser that the final value opinion is reliable. Appraisal Institute at 439. Utilizing more than one valuation approach may therefore be preferable because the approaches can then be used "simultaneously as cross-checks upon one another," which can be particularly important for complex, mineral-bearing land appraisals. *W. Pocahontas Props.*, 777 S.E.2d at 635-36 (quoting *W. Va. Dep't of Highways v. Sickles*, 242 S.E.2d 567, 569 (W. Va. 1978)).

¶ 29     In contrast to damages based on the fair market value of the property, losses suffered from the frustration of the landowner's special plan for the property are not compensable. *See* 4A Nichols on Eminent Domain at § 14.02(5). The prohibition on frustration-of-plan damages is based on the idea that an anticipated development plan cannot be viewed as an "accomplished fact," because such an approach ignores the substantial but unknown

costs involved in implementing the plan.  *See Schulhoff*, 167 Colo. at 77, 445 P.2d at 405.

¶ 30     The line between evidence of a hypothetical development plan, the frustration of which is not compensable in damages, and evidence of potential income generation, the admission of which is relevant to an income approach, is not always easy to draw.  In general, an owner cannot recover damages suffered by reason of being prevented from carrying out a particular scheme of improvement that exists only in contemplation at the time of trial. "However, under certain circumstances, evidence that a proposed use would result in a profit is admissible not for the purpose of enhancing the damages by showing the loss to the owner of a particular plan of operation, but to show that such proposed plan is a feasible plan and should be considered in fixing market value." 4A Nichols on Eminent Domain at § 14.02(5).  Thus, the hypothetical plan is only relevant to establish "the price on which a willing buyer and a willing seller would agree for the property *in its present condition*."  *Bd. of Assessment Appeals v. Colo. Arlberg Club*, 762 P.2d 146, 154 (Colo. 1988).

### 2. DPG's Evidence of Lost Income Was Not Admissible as the Measure of its Damages

¶ 31    DPG says that the court erred in excluding its evidence of lost income as damages from frustration of a hypothetical plan. It contends that its evidence of lost income was admissible under its income capitalization approach.

¶ 32    The County argues that DPG failed to characterize its methodology at trial as an income approach and should not be permitted to switch gears on appeal. In any case, the County says, even if DPG purported to use an income approach at trial, the lost income evidence was nonetheless inadmissible because lost income itself is not the proper measure of damages in an eminent domain case.

¶ 33    We agree with the County's second contention and, therefore, need not resolve its first, except to note that DPG's appraiser testified that he used an income approach in part, and that the County's attorney objected at various points during the trial to DPG's reliance on a flawed income approach.

¶ 34    We review the district court's ruling to exclude DPG's lost income evidence for an abuse of discretion. *See Bly v. Story*, 241

16

P.3d 529, 535 (Colo. 2010). An abuse of discretion occurs where the trial court's ruling was manifestly arbitrary, unreasonable, or unfair, or was based on a misunderstanding or misapplication of the law. *See Jackson v. Unocal Corp.*, 262 P.3d 874, 880 (Colo. 2011); *People v. Lopez*, 2016 COA 179, ¶ 43. Whether the court misapplied the law in making evidentiary rulings is reviewed de novo. *455 Co.*, 3 P.3d at 22-23.

¶ 35    As we have explained, just compensation in an eminent domain case is measured by the fair market value of the condemned property at the time of the taking and, with respect to damage to the residue, by the difference in fair market value of the residue before and after the condemnation. *Palizzi*, 228 P.3d at 962; 4A Nichols on Eminent Domain at § 14.02(3).

a.    Valuation of the Condemned Strip

¶ 36    DPG presented evidence of the fair market value of the condemned strip: its appraiser testified that each of the nineteen acres was worth $11,500; its mining expert testified that each of the gravel-producing acres was worth $10,000, and each non-income-producing acre was worth $5,000.

¶ 37     But DPG did not seek compensation based on its evidence of fair market value.  Instead, it calculated the total amount of income that might have been generated from the condemned property over ten years, applied a capitalization rate to arrive at a present value for the lost income, and then sought reimbursement for the prospective income.

¶ 38     The nineteen-acre strip, which contained seven-and-a-half minable acres and eleven-and-a-half agricultural acres had a fair market value, according to DPG's own experts, of somewhere between $132,500 (per the mining expert) and $218,500 (per the appraiser) (not including the $14,500 for the easements).  But DPG sought damages of approximately $1 million based on lost income.[6]

¶ 39     An "income approach" to valuation is not an exercise whereby an expert simply computes prospective income from the property and then requests reimbursement in that amount.  An income approach uses potential income from the property, along with all other factors that would be considered by a buyer, as evidence of

_____

[6] The results of the income approach should have aligned with the results of the experts' comparable sales approach.  But here, the nineteen-acre strip was 2.5% of the Property but represented about 15% of the Property's total value.

the *fair market value* of the property in its *current condition.* The principles underlying an income approach to valuation reflect the distinction "between income as a criterion of value and income as evidence of value." 5 Nichols on Eminent Domain at § 19.01. Net income alone is not "controlling on the issue of value"; it is merely one factor to be considered by the jury in conjunction with all other material evidence of fair market value. *Id.*; *see also De Freitas v. Town of Suisun,* 149 P. 553, 555 (Cal. 1915) ("The actual market value is the thing to be determined, and while net revenue should be considered, it does not, in general, furnish a conclusive measure of such market value."); *W. Pocahontas Props.*, 777 S.E.2d at 634 (The future earning power of real estate is "a powerful tool for calculating a fair market valuation of the real estate.").

¶ 40    Thus, DPG's evidence of a potential income stream was admissible not as the measure of its damages but rather, as the district court made clear in its order on the motions in limine, as a factor that could inform the fair market value of the Property. *See Mahaffey,* 697 P.2d at 775 (using income approach, appraiser considered other expert opinions regarding potential income stream from gravel mining and arrived at a fair market value of the entire

property).  And indeed, both the appraiser and the mining expert testified that the potential income stream from mining did inform their fair market valuations.  Though the experts primarily used a comparable sales approach, the comparable sales were of properties that had the potential to generate income.

¶ 41    DPG may believe, in hindsight, that the fair market valuations by its experts did not take adequate account of the Property's potential income.  But DPG was not entitled to present its lost income figures to the jury as an alternative to fair market value.  The income approach is an alternative to the comparable sales approach, but neither method is an alternative to fair market valuation — as we have noted, both approaches simply use different techniques for arriving at the fair market value of the property.  *See Jagow*, 49 P.3d at 1157.

### b.    Valuation of Damage to the Residue

¶ 42    The same methodological flaws plagued DPG's valuation of the damage to the residue.  DPG's theory was that the new road, which bisected Cell C, rendered approximately twenty-one acres of Cell C unsuitable for mining.  In its most simplified form, the mining expert's testimony established that the condemnation resulted in a

decrease in mining profits from Cell C in the amount of $2.1 million (in present value).

¶ 43    There are two problems with DPG's residue valuation method. First, compensation for damage to the residue is measured by the difference in fair market value of the *entire* residue immediately before and after the condemnation. *See Mack v. Bd. of Cty. Comm'rs,* 152 Colo. 300, 381 P.2d 987 (1963) (determination of residue damages based upon diminution in value of the entire residue). So it was improper for DPG to attempt to show a diminution in value of the 113 acres in Cell C only, when it retained an additional 627 acres of residue. *See* 4A Nichols on Eminent Domain at § 14.02(3)(a) ("[T]he landowner is entitled to receive, in addition to the value of the part taken, separate severance damages in order to be fully compensated for the diminution in value of *the property with which the landowner is left.*") (emphasis added); *see also City of Jacksonville v. Nixon,* 442 S.W.3d 906, 910 (Ark. Ct. App. 2014) ("In partial-takings cases, the landowner is entitled to the value of the lands taken, plus damages *to the lands not taken.*") (emphasis added).

¶ 44   Second, the measure of damages still turns on fair market value.  DPG's experts had to answer three questions: What was the fair market value of the entire residue immediately before the taking?  What was the fair market value of the entire residue immediately after?  And what was the difference?  *See W. Pocahontas Props.*, 777 S.E.2d at 645.  That 280 acres of the residue contained gravel deposits could have factored into the answer to those questions.  But DPG could not ignore the questions altogether and simply request reimbursement for its $2.1 million in lost income from Cell C.  Lost income is not a valid substitute for fair market value, whether the land at issue is the condemned property or the residue.

¶ 45   As we have noted, DPG offered evidence of the Property's fair market value.  Based on this admissible evidence, the jury determined that the nineteen-acre condemned strip had a fair market value of $183,795.

¶ 46   As for the diminution in value of the residue, DPG presented evidence that twenty-one acres of Cell C, which had been suitable for mining, was rendered non-income-producing as a result of the condemnation.  Based on the mining expert's testimony, the jury

22

could have determined that the twenty-one acres decreased in value from $10,000 per acre to $5,000 per acre, a diminution in value of $105,000. But the appraiser, who was offered as the expert in valuation, testified that each acre, regardless of its income potential, was worth about $11,500. If the jury credited the appraiser's testimony, it could have reasonably concluded that each of the twenty-one acres was worth $11,500 both before and after the condemnation, resulting in no diminution in value to the residue. The jury apparently credited the appraiser. DPG does not challenge the verdict as inconsistent with the valuation evidence admitted at trial.

c.     The Flawed Valuation Evidence Was Properly Excluded

¶ 47     We discern no error in the district court's exclusion of DPG's lost income figures. In the order on the motions in limine, the court explained that DPG's evidence was admissible to show the effect that the mining income "would have on the property's current fair market price." DPG, though, sought to present the evidence of lost income as its actual measure of damages, separate from (and irreconcilable with) the fair market valuation evidence presented by its experts. Because the lost income evidence, on its own, did not

23

reflect the proper measure of damages, the district court correctly excluded it. *See, e.g., City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r,* 105 P.3d 595 (Colo. 2005), (expert evidence properly excluded where expert's methodology was flawed); *see also Williams v. State,* 406 S.W.3d 273, 283 (Tex. App. 2013) (appraiser's testimony is unreliable and therefore inadmissible if the appraiser violated well-established rules of valuation).

¶ 48 To the district court, the lost income evidence, untethered to a fair market valuation, amounted to inadmissible frustration-of-plan damages. We need not decide whether we, too, would characterize the inadmissible evidence in the same way as the district court. It is enough to say that the district court was right to exclude the lost income evidence under these circumstances. *See People v. Phillips,* 2012 COA 176, ¶ 63 (appellate court may affirm trial court's evidentiary ruling on any ground supported by the record).

## C. Order on DPG's Costs

¶ 49 The district court declined to reimburse DPG for most of its expert witness fees, finding that DPG's costs were disproportionate to the judgment and that it was not entitled to reimbursement for expert testimony that was ultimately excluded. We review an award

of costs for an abuse of discretion.  *First Citizens Bank & Tr. Co. v. Stewart Title Guar. Co.*, 2014 COA 1, ¶ 50.  Therefore, we will only disturb the award if it is manifestly arbitrary, unreasonable, or unfair.  *Id.*  Because we conclude that the income valuation evidence presented by DPG's experts was properly excluded, we cannot conclude that the district court abused its discretion in limiting DPG's award of costs on this basis.

### III.    Conclusion

¶ 50    The judgment and cost order are affirmed.

JUDGE DAILEY and JUDGE MÁRQUEZ concur.